**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**NO. 1:21-CR-00301-TJK-1**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INFORMATION AND INCORPORATED MEMORANDUM OF LAW** |
| **STEPHEN ETHAN HORN,** | |
| *Defendant.* | |

Under the Due Process Clause of the Fifth Amendment, "the [government's] decision whether to prosecute [an individual] may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Stephen Ethan Horn is an independent multi-media journalist who covered the events that took place at the United States Capitol on January 6, 2021. But unlike other similarly situated journalists who did the same thing, Stephen Horn stands charged with four crimes for covering the January 6 events. Because the government's decision to prosecute him is based on an arbitrary classification as to which journalists warrant First Amendment protection from prosecution for covering the January 6 events, its prosecution of Mr. Horn constitutes "selective prosecution" in violation of the Fifth Amendment. On this basis, Mr. Horn moves the Court to dismiss all four charges contained in the Superseding Information.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 13, 2021, Mr. Horn was named in a four-count information charging him with four misdemeanor offenses: (i) entering and remaining in a restricted building, in violation of 18

U.S.C. § 1752(a)(1); (ii) disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. § 1752(a)(2); (iii) violent entry and disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).[1] The charges stem from events that took place at the United States Capitol on January 6, 2021.

Mr. Horn is a 25-year-old resident of Wake Forest, North Carolina with *no* criminal record. He graduated from Thomas Edison State University in 2018 with a BSBA in General Management and is currently employed as a software engineer for a company based in Wake Forest, North Carolina. In his free time, Mr. Horn serves as an independent, multimedia journalist. *See, e.g.*, https://twitter.com/stephenehorn (Twitter account for Stephen Horn, which has a total of 7,950 followers as of July 7, 2023).

Prior to January 6, 2021, Mr. Horn's journalistic background mainly included working on historical documentary projects. Then, in 2016 while on a mission trip with his church, he participated in an investigation of child abuse at a Nigerian orphanage funded by an American company. *See* "Persecuting the Persecuted: How Voice of the Martyrs Funded Abuse of Nigerian Orphans," REFORMATION BAPTIST CHURCH, available at http://persecutingthepersecuted.com/ (last visited July 3, 2023). *See also* Exhibit One, Letter from Nigerian Union of Journalists ("acknowledg[ing] the journalistic work that Stephen Horn participated in that resulted in the exposure of corrupt activities of prominent Nigerian, Isaac Newton Wusu"). Mr. Horn then began publishing independent journalism in the summer of 2020 with local coverage of protests, demonstrations, and riots in Raleigh, North Carolina.

---

[1] On February 25, 2022, the government filed a superseding criminal information that amended the wording of the charged counts but did *not* alter the substance of these charges. *See* D.E. 41.

Later that year, as rumors of potential protests surrounding the counting of the electoral college votes for the 2020 election escalated, Mr. Horn made plans to travel to the Capitol on January 6, 2021, so that he could document the events that might transpire that day. As he later told the Federal Bureau of Investigation (FBI), Mr. Horn specifically traveled to DC to observe the highly anticipated rally planned by former President Donald J. Trump and his supporters that concerned the results of the 2020 election. While Mr. Horn was there and now needless to say, things got out of hand.

When it became apparent that the rally was turning into something more, Mr. Horn was prepared to document the events with a video camera. Mr. Horn activated his camera and recorded almost all of what he witnessed on January 6, 2021, regarding the events that took place in and around the Capitol grounds. Though Mr. Horn entered the Capitol with the mob and did not possess any sort of press credential, his *individual* purpose was not to *participate* in the events surrounding a potential challenge to the certification of the electoral college—but rather to *document* it, so that he and the American people would be able to better understand exactly what happened that day.

Mr. Horn has consistently maintained that he entered the Capitol on January 6, 2021, for strictly newsgathering purposes. To that end and upon his return to North Carolina, he posted the approximately two-hour long footage of what he witnessed that day to his Facebook and Rumble[2] accounts with the following caption:[3]

> I was in DC today when the capitol was stormed. This is the full, unedited footage I took. It contains mature content. A few notes about what I witnessed:

---

[2] Rumble is an online video sharing platform similar to YouTube. *See* SMALL BUSINESS TRENDS, *What is Rumble?*, https://smallbiztrends.com/2022/02/what-is-rumble.html (Feb. 21, 2022).

[3] On January 11–12, 2021, Mr. Horn also posted a Twitter thread documenting his January 6, 2021 experience, which included clips of the full video posted to Facebook and Rumble. *See* https://twitter.com/stephenehorn/status/1348723442972053506?s=20&t=QhSz6g2PROjr9ekTqVDBpw.

The people inside the capitol were not, by and large, antifa. If there were antifa involved in the criminality that occurred, they only formed a small percentage.

This was not a peaceful protest. I saw many instances of pushing against police officers, as well as at least one instance where a barrage of projectiles was thrown. Once we were inside, it seemed there were at least as many in the crowd trying to actively prevent harm to police officers as there were who were trying to attack them or push them back.

I was a little surprised at the lack of property destruction I witnessed, compared to some of the left wing riots in Raleigh[, North Carolina] that happened this year. While I did see a broken mirror and other destruction in Rep. Pelosi's office, I did not see much destruction for destruction's sake.

I did not see the incident in which a woman was shot by capitol [police] (now ID'd as Ashli Babbitt), I did see a man who appeared to have fallen from some height and was laying on an improvised stretcher. Someone who appeared to be examining him said he had broken both his legs. I don't know if this was accurate, or if he ended up being one of the three others confirmed to have died in "medical emergencies" at the scene.

I did not enter the capitol building as part of the protest, or for cheap thrills, but to accurately document and record a significant event which was taking place. Feel free to share, download, [or] repost this video or any clip from it.

See Exhibit Two, Stephen Horn's Facebook and Rumble Posts. See also Charles Duncan, *N.C. man claiming to be independent journalist during Capitol riot pleads not guilty*, SPECTRUM NEWS, available at https://spectrumlocalnews.com/nc/charlotte/news/2022/01/10/north-carolina-man-admits-he-was-in-the-capitol-during-jan--6-attack--pleaded-not-guilty (Jan. 10, 2022) (interview of Mr. Horn in which he again stated that he went to the Capitol "to document what was happening as an independent journalist").

Since Mr. Horn made these initial posts publicly available, Mr. Horn's video journalism related to January 6, 2021, has received over 1,000,000 combined views across several platforms.

Also after he returned to North Carolina, Mr. Horn contacted both the FBI and the North Carolina Department of Justice (NCDOJ) to inform these authorities that he possessed "footage

of crimes which were committed at the US Capitol on January 6th." *See* Exhibit Three, Horn's

Tips to FBI and NCDOJ. Mr. Horn offered this footage to the authorities in an effort to assist

them with investigating crimes that were committed at the Capitol. *See id.*

The FBI eventually contacted Mr. Horn on January 15, 2021. Mr. Horn cooperated with

the FBI and agreed to an interview with agents at its Cary, North Carolina field office on

February 24, 2021. The information he provided during that interview, as well as other evidence

collected by the FBI, corroborated Mr. Horn's position that he entered the Capitol for purely

journalistic reasons. *See* D.E. 1-1 at 2 (affidavit submitted in support of criminal complaint citing

a tip from an individual who believed "HORN was inside the U.S. Capitol as a journalist").

Even so, the government has charged Mr. Horn with four different crimes pertaining to

his actions on January 6, 2021. Mr. Horn has pled "not guilty" to all four charges, and his trial is

scheduled for September 13, 2023. *See* D.E. 57.

In September 2021 and to assist in the preparation of his defense, Mr. Horn submitted an

informal discovery request to the government for information pertaining to the decision to

prosecute him, given his status as a journalist and his unequivocal motivations for attending the

January 6 events. *See* Exhibit Four, Emails Between Counsel. In response, the government

responded as follows:

> You can tell Mr. Horn this: the Attorney General recently issued a
> memorandum on "Use of Compulsory Process to Obtain
> Information from, or Records of, Members of the News Media."
> This memorandum and the applicable regulations relating to
> members of the news media, including 28 C.F.R. sec. 50.10, are
> binding upon all Department attorneys. Like all other components
> within the Department, the U.S. Attorney's Office for the District of
> Columbia is ensuring that these policies – in Mr. Horn's case and all
> others handled by its prosecutors – are scrupulously followed.
> Likewise, the Department institutes training, accountability, and
> disciplinary measures that reinforce the importance of adherence to
> such requirements. Department attorneys who fail to comply with

> the relevant policies can be subject to discipline and administrative
> sanction.

*See* Exhibit Four at 3.

On February 25, 2022, and after a different attorney substituted as counsel for the government in this matter, Mr. Horn renewed his request for the government to provide additional information regarding the Department's First Amendment policies as applied to Mr. Horn's case. *Id.* at 2. The government maintained its position from September 2021. *Id.* at 1.

Mr. Horn thereafter moved this Court to compel the government to provide the requested information, arguing that it is "material either to guilt or to punishment" under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), or, in the alternative, should be disclosed as evidence of a potential selective prosecution claim. *See* D.E. 45–50. At an October 24, 2022, hearing, the Court denied Mr. Horn's motion. The Court ruled that the requested information was not *Brady* material and that Mr. Horn had failed to present enough information to support a potential selective prosecution claim. In doing so, however, the Court stated that "if Mr. Horn wants to try to meet the standard for selective discovery related to a selective prosecution claim and request some other subset of information leveraging some other evidence, [it would] take that up if it gets filed." *See* Hearing Tr. 26, *United States v. Stephen Ethan Horn*, No. 1:21-cr-00301-TJK-1 (D.D.C. Oct. 24, 2022).

Over the next few months, Mr. Horn engaged in substantive discussions with the government regarding potential next steps in his case. *See* Exhibit Four at 5 (email referencing Mr. Horn's request for a meeting with the government regarding why Mr. Horn "should be afforded member of the media status"). These discussions culminated in a February 17, 2023, meeting between undersigned counsel and the government, at which time Mr. Horn asked the government to reconsider its decision to prosecute Mr. Horn given his purely journalistic role

with respect to the January 6 events. The government agreed to do so, conditioned upon the requirement that Mr. Horn assemble and submit material to its Policy and Statutory Enforcement Unit (PSEU) documenting his journalistic endeavors prior to January 6, 2021.[4]

Mr. Horn submitted the requested material to the government's PSEU on March 31, 2023. *See* Exhibit Four at 7–8. On May 1, 2023, the government informed Mr. Horn that "PSEU ha[d] reviewed the information submitted and . . . declined to alter its decision" that Mr. Horn should *not* be afforded First Amendment protection as a journalist for his work in covering the January 6 events. *Id.* at 7. When asked for an explanation or justification for its PSEU's decision, the government responded: "Unfortunately, we do not have any further information to share." *Id.* at 6.

Meanwhile, two other independent journalists who entered the Capitol on January 6, 2021, *with* the crowd and *without* any sort of press credential, Jeremy Lee and Stephen Baker, have similarly been interviewed by and cooperated with the FBI regarding their conduct and what they witnessed on January 6. However, neither Mr. Lee nor Mr. Baker have been charged with any crime for their conduct on that day. *See* Exhibits Six–Seven, Affidavits of Jeremy Lee and Stephen Michael Baker.

---

[4] PSEU is a division within the Department of Justice that is "responsible for evaluating requests for authorization from United States Attorney's Offices (USAOs) and DOJ components regarding investigative and prosecutorial tools under PSEU's purview. PSEU analyzes requests from USAOs and DOJ attorneys for Department authorization to use, or consultation about, numerous investigative tools or prosecutorial actions, including:
- Obtaining information from or about members of the news media;
- Closing judicial proceedings to the public in federal criminal cases;
- Providing statutory use immunity for federal witnesses;
- Issuing subpoenas to attorneys for information relating to their representation of clients;
- Applying for search warrants to search the premises or electronic storage devices of attorneys; and
- Initiating a federal prosecution following a state prosecution of an individual."
*See* Exhibit Five, Job Posting for Position with PSEU.

Mr. Horn can thus show that other journalists with whom he is similarly situated have not been charged with crimes for covering the January 6 events. This fact and other indirect evidence, including the government's emails contained in Exhibit Four, reveal that the government's decision to prosecute Mr. Horn is motivated by an improper, discriminatory purpose, i.e., the government's arbitrary decision to honor the First Amendment right of some independent journalists to gather news at the Capitol on January 6, 2021, but not Mr. Horn's. The government's prosecution of Mr. Horn is therefore "selective," in violation of the Due Process Clause of the Fifth Amendment. For that reason, the Court should dismiss all four charges pending against him. In further support, he states as follows:

## II. ARGUMENT

The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V. It protects the integrity of criminal prosecutions by, among other things, subjecting prosecutorial discretion to "constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 115 (1979). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment,". . . "is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464 (quoting *Oyler*, 368 U.S. at 448, 456 (1962)).

By raising "selective-prosecution claims under the Equal Protection Clause[,] . . . a party . . . seeks to prevent his or her own prosecution." *United States v. Texas*, No. 22-58, 2023 WL 4139000, at *7 (U.S. June 23, 2023). As such, "[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463.

The claim is thus ordinarily raised by a pretrial motion to dismiss the charges "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." FED. R. CRIM. P. 12(b)(3)(A)(iv). Rule 12 "permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense'" raised by the motion. *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)).

"Generally, motions are capable of determination before trial if they raise questions of law rather than fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976); *see also United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (concluding that the district court correctly "consider[ed] the purely legal question" raised by the defendant's pretrial motion to dismiss (citations omitted; abrogated on other grounds)). However, a district court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Jones*, 542 F.2d at 664.

For selective prosecution claims raised by pretrial motion, a defendant must make two showings. First, he must show that the government's actions had a discriminatory effect, i.e., he must demonstrate that the government afforded "different treatment" to individuals "similarly situated" to the defendant. *Armstrong*, 517 U.S. at 470; *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (stating that a defendant must show that he was "singled out for prosecution from among others similarly situated" (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)). Second, the defendant must show that the government's decision to single him out was "improperly motivated, i.e., based on race, religion, or another

arbitrary classification." *Branch Ministries*, 211 F.3d at 144 (quoting *Washington*, 705 F.2d at 494).

### (A) The "Similarly Situated" Requirement

An uncharged individual is "similarly situated" to a charged defendant "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Branch Ministries*, 211 F.3d at 145 (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir.1997)). "[F]or selective prosecution purposes," the Eleventh Circuit defines an uncharged individual to whom a defendant is "similarly situated" as:

> one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant.

*United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).

Even though courts "narrowly" interpret the "similarly situated" requirement, Mr. Horn can easily satisfy this prong. *See United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019).

Again, Mr. Horn is an independent journalist who traveled to Washington, DC on January 6, 2021, solely to "document and record a significant event which was taking place." *See* Exhibit Two. In doing so, he captured valuable footage of the events by entering the Capitol with the crowd of rioters. At that time, he did not possess any sort of press pass or credential that allowed him to enter the Capitol. When he left the Capitol and later returned to North Carolina, he promptly distributed his recording and the information he obtained via Facebook and Rumble.

He also submitted tips to law enforcement, including the FBI, offering to share the information he had obtained with law enforcement. *See* Exhibit Three.

Upon information and belief, there were many independent journalists who similarly went to Washington, DC to cover the January 6 events and, in doing so, entered the Capitol with the rioters and without any sort of press credential. Affidavits from two such journalists, Jeremy Lee and Stephen Baker, are submitted as exhibits to this motion in support of Mr. Horn's selective-prosecution claim. *See* Exhibit Five, Affidavit of Jeremy Lee, and Exhibit Six, Affidavit of Stephen Baker.

<u>(i) Similarly Situated Individual #1: Jeremy Lee</u>

Like Mr. Horn, Jeremy Lee was an independent journalist "*not* employed by a news media company" in January 2021. Exhibit Five at 1. In that capacity, Mr. Lee traveled to "the events that took place at the United States Capitol on January 6, 2021." *Id.* at 3. Mr. Lee entered the Capitol with the crowd of rioters, and in doing so, he "did not have a credential or press ID." *Id.*

While in the Capitol, Mr. Lee, like Mr. Horn, made use of his surroundings in order to enhance his newsgathering efforts. Specifically, Mr. Lee "propp[ed] [him]self up on a couch [in the Capitol] to film." *Id. Compare with* D.E. 1-1 at 2 (affidavit submitted in support of criminal complaint showing picture of Mr. Horn utilizing surroundings inside the Capitol to gain a better camera angle of the rioters). And like Mr. Horn, Mr. Lee entered the office of a sitting member of Congress. *See* Exhibit Six at 3 (stating that, "[t]o follow the action and document what" he "observed that day, it was necessary for" Mr. Lee "to crawl through a broken window and enter the congressional offices of . . . Senator James Risch"). *Compare with* Exhibit Two (referencing Mr. Horn having entered "Rep. Pelosi's office").

After January 6, Mr. Lee published the content he recorded and information he obtained at the Capitol "to Twitter, Facebook, and YouTube." Exhibit Six at 4. The FBI initially contacted Mr. Lee in March 2021, and he agreed to an initial phone interview with the FBI on April 12, 2021. *Id.* at 5. Mr. Lee then participated in an in-person interview with the FBI in Los Angeles, CA on or about May 14, 2021, during which Mr. Lee "had a candid conversation on [his] impressions of not just the Capitol on January 6, 2021, but of political violence in general." *Id.* at 6. Despite his actions in entering the Capitol with the crowd and without any sort of press credential, Mr. Lee has "not been charged with *any* crime relating to the January 6, 2021, events at the Capitol." *Id.*

In reporting the information he obtained at the Capitol on January 6, Mr. Lee met Stephen Horn, whom he now recognizes "as a seasoned journalist" who is "both transparent in his coverage and very interested in pursuing the truth behind what [they] had both documented that day." *Id.* at 8. Since then, Mr. Lee has hosted Mr. Horn as a guest on his podcast on two different occasions and is very familiar with the content Mr. Horn recorded in the Capitol. *Id.* at 6–8. He also knows that Mr. Horn, like himself, "has worked to disseminate the valuable information he obtained regarding the January 6 events to the public via a variety of outlets" and that "Mr. Horn's work has been cited in articles from other news sources." *Id.* at 9. Finally, Mr. Lee knows that, *unlike* himself, "Mr. Horn has been charged with crimes stemming from his important work in covering the January 6, 2021, events at the Capitol." *Id.*

### (ii) Similarly Situated Individual #2: Stephen Michael Baker

Stephen Michael Baker is another independent journalist who entered the Capitol on January 6, 2021. Like both Mr. Horn and Mr. Lee, Mr. Baker is "*not* employed by any news media company" and "personally disseminate[s] all information [he] gather[s]," while "also

periodically collaborat[ing] with established news and media organizations." Exhibit Seven at 1. Now 63 years old, Mr. Baker has been "an independent journalist for more than 20 years." *Id.*

Like Mr. Horn, Mr. Baker traveled to Washington, DC on January 6, 2021, from his home state of North Carolina. Mr. Baker first "arrived at the Washington Monument Lawn" around 9:30 that morning "to cover the speeches taking place on The Ellipse stage." *Id.* at 2. Unable to record as he wished due to the conditions, he then began walking towards the Capitol. *Id.*

Around 1:10 pm, Mr. Baker neared the west side of the Capitol and began hearing police sirens. Hearing explosions and seeing smoke, Mr. Baker ran "to the lower west terrace and began videoing the violence that was taking place on the west terrace." *Id.* He "continued filming the chaos and violence" for another hour "until there was a movement by the crowd toward the upper west terrace." *Id.* "After several hundred people made their way up the stairs, [Mr. Baker] then followed." *Id.*

Mr. Baker eventually entered the Capitol at the Senate Wing Door at 2:19 pm on January 6. In doing so and like Mr. Horn, he "did not have any press credentials" and "was carrying a backpack with [his] camera tripod, spare batteries, microphone, and other electronic accessories." *Id.* at 3. Mr. Baker remained inside the Capitol for 40 minutes, and in doing so, he "attempted to capture as much of the newsworthy activity as possible." *Id.*

Like Mr. Horn, Mr. Baker "utiliz[ed]" property inside the Capitol "to get optimal camera angles," namely, "empty spaces or benches." *Id.* But while it was the strategy of Mr. Horn and Mr. Lee to remain safe in the Capitol by "blending in with the disorderly crowd," *see* Exhibit Six at 8, Mr. Baker "primarily tried to stay above and away from whatever the protestors were doing." Exhibit Seven at 3.

After leaving the Capitol, Mr. Baker "engaged in a number of interviews with local news agencies" in DC. *Id.* He then returned to North Carolina and was not contacted by the FBI until July 22, 2021. *Id.* at 4. Mr. Baker agreed to an interview with the FBI, but on the day the meeting was scheduled, Mr. Baker was informed that the meeting needed to be rescheduled "because [his] status as a member of the press required [the FBI] to acquire a letter of permission from the US Attorney General's Office" prior to the interview. *Id.* Through his attorney, Mr. Baker was then able to negotiate and execute a proffer agreement with the government that presumably gave him significant legal protection. *Id.* Pursuant to this agreement, Mr. Baker gave a protected statement to the FBI on October 18, 2021. *Id.* Since that time and as of today, Mr. Baker has "not been charged with *any* crime for [his] work in covering the January 6, 2021, events at the Capitol." *Id.* at 3.

While engaging in journalistic work related to January 6, Mr. Baker developed a relationship with Mr. Horn, learning that he too is an independent journalist. *Id.* at 4. According to Mr. Baker, Mr. Horn's journalism prior to January 6 included "covering the post-George Floyd riots in the summer of 2020, as well as his earlier work covering historical events at Gettysburg, Appomattox, and Waterloo, as well as other work he has done covering news events in the Raleigh, North Carolina region." *Id.*

Mr. Baker knows that, like himself, Mr. Horn went into the Capitol with the crowd on January 6, 2021, as an independent journalist without "any sort of press pass or credential purporting to give him permission to enter the building." *Id.* at 5. From "independent investigation" of Mr. Horn's actions on January 6, 2021, Mr. Baker knows that Mr. Horn, like himself, "did not engage in any violence or riotous behavior while in the Capitol . . . and . . . was

at the Capitol on January 6, 2021, as a journalist to document the events for newsgathering purposes, rather than to participate in a riot or protest." *Id.*

Since January 6, 2021, Mr. Baker also knows that Mr. Horn has worked diligently "to disseminate the valuable information he obtained regarding the January 6 events to the public" and that "Mr. Horn's work has been cited in articles from other news sources." *Id.* And finally, Mr. Baker knows that Mr. Horn, *unlike* himself, "has been charged with crimes stemming from his important work in covering the January 6, 2021, events at the Capitol." *Id.*

<u>(iii) Mr. Lee, Mr. Baker, and Mr. Horn are "Similarly Situated"</u>

The accounts of Jeremy Lee and Stephen Baker mirror that of Mr. Horn's. While there may be minor differences with respect to, for example, individual backgrounds and the means each journalist utilized to stay safe on January 6, 2021, such differences involve characteristics that are not "*legitimate* prosecutorial factors that . . . justify making different prosecutorial decisions with respect to" each individual. *See Hastings*, 126 F.3d at 315 (emphasis added).

Using the Eleventh Circuit's "similarly situated" definition, Mr. Lee and Mr. Baker "engaged in the same type of conduct" in which Mr. Horn engaged, thereby "commit[ing] the same basic crime[s] in substantially the same manner as [Mr. Horn]." *Smith*, 231 F.3d at 810. As such, a prosecution of either Mr. Lee or Mr. Baker "would have the same deterrence value [as a prosecution of Mr. Horn] and would be related in the same way to the Government's enforcement priorities and enforcement plan." *Id.* And finally, the evidence against Mr. Lee and Mr. Baker is "as strong or stronger than that against" Mr. Horn. *Id.* Since that infamous day, none of these brave journalists have shied away from telling their stories regarding what they did and witnessed on January 6, 2021.

With the affidavits of Mr. Lee and Mr. Baker, Mr. Horn has thus shown that two other individuals with whom he is "similarly situated" have *not* been charged with crimes for conduct in which they *all* engaged on January 6, 2021. Thus, the government's decision to single Mr. Horn out for prosecution has had a "discriminatory effect," as required by the first element of a selective-prosecution claim. *Armstrong*, 517 U.S. at 465.

*(B) The "Improper Motivation" Requirement*

The second showing necessary to establish Mr. Horn's claim of selective prosecution—that the government's decision to charge him, but not other journalists with whom he is similarly situated, was motivated by an improper purpose—is admittedly more difficult for Mr. Horn to prove directly. *See United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (noting that "[d]irect evidence of that purpose is rarely available"). As such, "courts permit defendants to use statistical disparities and other indirect evidence to show intent." *Id.*

The emails contained in Exhibit Four show that the government has resisted every attempt Mr. Horn has previously made to determine the government's reasons for prosecuting him but not other independent journalists with whom he is similarly situated that went into the Capitol without a press credential. Each time Mr. Horn has asked the "why" question—i.e., why has the government chosen to afford, seemingly arbitrarily, First Amendment protection from prosecution to some independent journalists but not others—the government has declined to answer and remained nontransparent. *See* Exhibit Four.

While it would be ideal for Mr. Horn to have the government's answer for purposes of proving the second element of his selective-prosecution claim, perhaps the government's silence alone is enough to establish a constitutional violation. In *Sherrill v. Knight*, the D.C. Circuit held that a journalist's First Amendment liberty interest in obtaining a White House press pass was

denied without due process of law, as required by the Fifth Amendment, where the government

never gave the journalist "notice, [an] opportunity to rebut, and a written decision" regarding its

specific reasons for denying his application for the pass. *See* 569 F.2d 124, 128 (D.C. Cir. 1977).

At the time, the government's standard response in denying a journalist's application for a White

House press pass was to generally cite: "reasons relating to the security of the President and/or

the members of his immediate family." *Id.* at 127. After submitting an application that was

denied with such a response, the journalist in *Sherrill* followed up with a request for additional

reasons as to why *his* application had been rejected. *See id.* The government responded: "we

can't tell you the reasons." *Id.*

      In evaluating whether the government's denial of the journalist's pass without "notice,

[an] opportunity to rebut, and a written decision" violated his Fifth Amendment right to due

process of law, the court first recognized "that the interest of a bona fide Washington

correspondent in obtaining a White House press pass is protected by the first amendment." *Id.* at

131. While the public may not have a "general First Amendment right to enter the White House,

. . . once the White House opens a portion of it up to reporters for their use, some kind of First

Amendment liberty interest protected by a due process right is created." *See* Hearing Tr. 7–8,

*Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610-TJK (D.D.C. Nov. 16, 2018) (discussing

*Sherrill*). *See also Sherrill*, 569 F.2d at 130 (holding that "White House press facilities having

been made publicly available as a source of information for newsmen, the protection afforded

newsgathering under the first amendment guarantee of freedom of the press . . . requires that this

access not be denied arbitrarily or for less than compelling reasons").

      The court then concluded that the means through which the government denied the

*Sherrill* journalist's application fell woefully short of the process required by the Fifth

Amendment. *Id.* at 131 (holding that "notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut is a minimum prerequisite for ensuring that the denial is indeed in furtherance of Presidential protection, rather than based on arbitrary or less than compelling reasons"). *See also id.* at 130 (finding that "[m]erely informing individual rejected applicants that rejection was for 'reasons of security' does not inform the public or other potential applicants of the basis for exclusion of journalists" and that "the phrase 'reasons of security' is unnecessarily vague and subject to ambiguous interpretation").

  *Sherrill* establishes at least three important principles that apply to Mr. Horn's case. First, journalists have a protected First Amendment liberty interest in gathering the news. *Id.* at 129–30. *See also* Hearing Tr. 13, *Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610-TJK (D.D.C. Nov. 16, 2018) (stating that "the First Amendment interests . . . recognized in *Sherrill* . . . were liberties of the individual journalists themselves" and "not vested merely in publications or agencies"). Second, for the government to deprive a journalist of such a right, it must afford the individual journalist due process of law in doing so, as required by the Fifth Amendment. *Sherrill*, 569 F.2d at 131. Third, if the government permits some journalists to conduct newsgathering business in certain areas, it cannot deny the right of other journalists to do the same without legitimate, compelling reasons that are made known to the journalist(s) sought to be excluded. *Id.* at 129–30 (concluding that "White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this access not be denied arbitrarily or for less than compelling reasons" and "that individual newsmen [may] not be arbitrarily excluded from sources of information").

Here, the government's refusal to provide Mr. Horn with *any* sort of explanation for denying him First Amendment protection from prosecution as a January 6 journalist constitutes a violation of his Fifth Amendment right to due process of law. The government's responses captured in Exhibit Four are markedly similar to the government's responses in *Sherrill*. *Compare id.* at 127 ("we can't tell you the reasons") *with* Exhibit Four at 6 ("Unfortunately, we do not have any further information to share."). Such responses do little "to inform the public[, Mr. Horn,] or other potential applicants of the basis for" the denial of his First Amendment liberty interest in gathering the news. *Sherrill*, 569 F.2d at 130.

To this date, "whatever process occurred within the government" in deciding to prosecute Mr. Horn but not other similarly situated independent journalists remains "shrouded in mystery." *See* Hearing Tr. 9, *Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610-TJK (D.D.C. Nov. 16, 2018). Mr. Horn submits that the government's refusal to provide such an explanation and reason for its prosecutorial decision constitutes "indirect evidence" showing an intent to prosecute him that is motivated by an improper purpose. *See Judd*, 579 F. Supp. 3d at 4. This silence, combined with the fact that the government has refrained from prosecuting other independent journalists with whom Mr. Horn is similarly situated, shows that the government's prosecution of Mr. Horn is impermissibly discriminatory. *See Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997) (observing that, in equal protection cases, "evidence concerning the *unequal application of the law*, statistical disparities and other indirect evidence of intent may be used to show bias or discriminatory motive" (emphasis added)).

For these reasons, Mr. Horn maintains that he has established both elements needed to prove a selective-prosecution claim, i.e., that the government's decision to charge him but not others similarly situated has had (i) a "discriminatory effect" and (ii) was motivated by a

"discriminatory purpose." *Armstrong*, 517 U.S. at 465. Mr. Horn therefore maintains that the Fifth Amendment bars the instant prosecution, and he moves the Court to dismiss his charges on that basis.

Alternative Motion to Compel Discovery

Based on the affidavits of Jeremy Lee and Stephen Baker, Mr. Horn has made "a credible showing of different treatment of similarly situated persons," such that the Court should at least compel the government to produce "discovery in aid of" his selective-prosecution claim. *Armstrong*, 517 U.S. at 470, 468. Such a showing "is sufficient to support a hearing and related discovery on selective prosecution." *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir. 1986) (citing *Wayte v. United States*, 470 U.S. 598, 615 (1985) (Marshall, J., dissenting)).

Courts in this district have required a defendant to "present 'at least a colorable claim' of selective prosecution before any discovery is permitted." *Judd*, 579 F. Supp. 3d at 5 (quoting *Att'y Gen. v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C. Cir. 1982)). "A colorable claim is one that presents 'some evidence tending to show the existence of the essential elements' of selective prosecution." *Judd*, 579 F. Supp. 3d at 5 (quoting *Armstrong*, 517 U.S. at 468).

Mr. Horn submits that the above analysis and attached exhibits carry his "rigorous" burden in showing that the government's decision to prosecute him is based on an "unjustifiable," "arbitrary classification." *Armstrong*, 517 U.S. at 468, 464. Should the Court disagree, however, he moves the Court, in the alternative, to compel the government to "assemble from its own files [any material] which might corroborate or refute [his] claim" of selective-prosecution. *Id.* at 468.

### III. CONCLUSION

Stephen Horn is an independent journalist who went to the Capitol to document and record a significant event in our nation's history of which the American people needed to be aware. This fact was true before the FBI initially contacted him, and it remains true today, over two years since he was charged with crimes for his journalism on January 6, 2021. In charging him, the government has unfairly singled him out from among the many other journalists who did the same thing and have not been charged with crimes for their newsgathering efforts.

The government itself recently acknowledged that "journalism is not a crime." *See* Kelly Garrity, *'Journalism is not a crime': Biden salutes press, stresses freedoms at WHCD*, POLITICO, https://www.politico.com/news/2023/04/29/journalism-is-not-a-crime-biden-salutes-press-stresses-freedoms-at-whcd-00094543 (April 29, 2023) (quoting President Biden's proclamation, at the White House Correspondents' Dinner in April 2023, that "journalism is not a crime"). As such, its prosecution of Mr. Horn, a bona fide journalist, shows that it is arbitrarily deciding to whom this maxim applies, i.e., who is a journalist protected from prosecution and who is not and thus may be charged. As the Constitution forbids the government from making prosecutorial decisions on such "arbitrary," "unjustifiable" standards, *see Armstrong*, 517 U.S. at 464, its prosecution of Mr. Horn violates his Fifth Amendment right to equal protection and due process of law. On this basis, he moves the Court to dismiss the superseding information.

******************************

Respectfully requested this 7th day of July, 2023.

                                      **_/s/ Marshall H. Ellis_**
                                      MARSHALL H. ELLIS
                                      Hornthal, Riley, Ellis & Maland, LLP
                                      301 East Main Street
                                      Elizabeth City, NC 27909
                                      Telephone: 252-335-0871
                                      Fax: 252-335-4223
                                      Email: mellis@hrem.com
                                      N.C. State Bar No. 47720
                                      Retained Counsel for the Defendant

                                      **_/s/ Charles R. Haskell_**
                                      Charles R. Haskell
                                      LAW OFFICES OF CHARLES R. HASKELL, P.A.
                                      641 Indiana Ave. NW
                                      Washington, DC 20004
                                      (202) 888-2728
                                      Email: charles@charleshaskell.com
                                      DC Bar No. 888304007
                                      Retained Counsel for the Defendant

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served upon:

Ashley Akers
DOJ-CIV
Commercial Litigation Branch
1100 L Street Northwest
Washington, DC 20530
(202) 353-0521
Email: ashley.akers@usdoj.gov

Sonia Williams Murphy
DOJ-CIV
Civil Division - Commercial Litigation Branch
1100 L Street NW
Washington, DC 20530
202-305-3067
Email: sonia.murphy@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on July 7, 2023, using the CM/ECF system which will send notification of such filing to the above.

This the 7th day of July, 2023.

/s/ *Marshall H. Ellis*
MARSHALL H. ELLIS
Hornthal, Riley, Ellis & Maland, LLP
301 East Main Street
Elizabeth City, NC 27909
Telephone: 252-335-0871
Fax: 252-335-4223
Email: mellis@hrem.com
N.C. State Bar No. 47720
Retained Counsel for the Defendant

/s/ *Charles R. Haskell*
CHARLES R. HASKELL
LAW OFFICES OF CHARLES R. HASKELL, P.A.
641 Indiana Ave. NW
Washington, DC 20004
(202) 888-2728
Email: charles@charleshaskell.com
DC Bar No. 888304007
Retained Counsel for the Defendant

23