UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NO. 1:21-CR-00301-TJK-1

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEPHEN ETHAN HORN,<br><br>*Defendant.* | DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS (D.E. 70) |

In responding to Stephen Horn's claim of selective prosecution, the government unsurprisingly attempts to distinguish Mr. Horn from the uncharged independent journalists who entered the Capitol with the crowd on January 6, 2021, without any sort of press pass or credential. In doing so, it paints a picture of Mr. Horn that is inaccurate and unsupported by the facts. Then, for the facts it correctly recounts in comparing Mr. Horn to the uncharged independent journalists who went into the Capitol, the government argues these immaterial differences constitute "legitimate prosecutorial factors that . . . justify making different prosecutorial decisions." *See* D.E. 70 at 11 (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000)). For purposes of a selective prosecution claim, however, Mr. Horn is not required to show that his background and activity on January 6, 2021, are *identical* to that of the uncharged journalists. Instead, he need only show that he is "similarly situated" to them. *See id.*

Finally, with respect to the requirement that Mr. Horn show the government's decision to charge him was based on an improper purpose, the government states that Mr. Horn impermissibly relies on "insinuation and inference." *See* D.E. 70 at 13. But reliance on such "indirect evidence to show intent" is proper and to be expected when Mr. Horn has no other

1

means of proving this element. *See United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (further noting that "[d]irect evidence of that purpose is rarely available"). Even so, this Court has applied the Fifth Amendment's due process clause to require the government to afford a journalist some form of process if and when it infringes upon his First Amendment right to gather the news. *See* Hearing Tr., *Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610-TJK (D.D.C. Nov. 16, 2018) (discussing *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977)).

For these reasons, Mr. Horn asks this Court to dismiss the charges or, in the alternative, to at least order the government to produce material "which might corroborate or refute [his] claim" of selective prosecution. *See United States v. Armstrong*, 517 U.S. 456, 468 (1996). In reply to the government's response, he further states as follows:

*(I) Case-Specific Facts*

The government's portrayal of Mr. Horn's words and actions before, during, and after January 6, 2021, attempts to show he went to the Capitol on January 6, 2021, to riot, rather than gather the news as a journalist. He did not. Mr. Horn writes to address this myth and other factual inaccuracies in the government's response.

Out of the gate, the government misreports what Mr. Horn wore to the Capitol on January 6, 2021, perhaps in an attempt to show he went there with ill intent. *See* D.E. 70 at 2 (stating that Mr. Horn "wore a black helmet, black gloves, black jacket, and carried a black backpack"). Mr. Horn's jacket was green, not black, and the government should be aware of this fact because the jacket he wore that day is the same one he brought to his FBI interview in February 2021. Mr. Horn brought the jacket to the interview to allow the FBI to inspect it and take custody of an item Mr. Horn had picked up at the Capitol and put into one of the jacket's pockets. *See also id.* at 3 (picture of Mr. Horn wearing a *green* jacket).

After he entered the Capitol, the government claims Mr. Horn "traveled to the Crypt, where he witnessed law enforcement officers being sprayed with a fire extinguisher." *Id.* Again, this assertion is not accurate based on what Mr. Horn told the FBI. Mr. Horn witnessed an individual *throw* a fire extinguisher at the police, but he did not witness anyone spraying a fire extinguisher at law enforcement officers. In his FBI interview, Mr. Horn described to the agents, as best he could, the characteristics of the individual who hurled the fire extinguisher.

The government is correct in stating that Mr. Horn entered Speaker Pelosi's office and commented to another person about only learning it was the Speaker's office after seeing "a medal to her." *Id.* at 3. But the government's response omits the fact that Mr. Horn was quick to then tell the same person: "don't break it."

The issue of whether Mr. Horn joined a chant inside the Capitol is *far* from certain, as the government maintains.[1] *See id.* at 8 (claiming that Mr. Horn "joined rioters chanting 'USA!,'"); *id.* at 11 (arguing that Mr. Horn "did participate in the chanting"). From Mr. Horn's video, it is clear that, while at the Capitol, he was in close proximity to many groups of rioters who engaged in different chants. But whether Mr. Horn participated in any such chant is far from clear. Elsewhere, the government's response even appears to concede that it is difficult to determine, with certainty, whether he participated in a chant. *See id.* at 3 (stating "*[a] voice consistent with the defendant's voice* can also be heard chanting 'USA!' while defendant is in the Capitol building" (emphasis added)).

But *even if* Mr. Horn joined a chant at some point, that fact alone does not mean he was there to participate in the riot, rather than document it as a journalist. One must consider the

---

[1] Mr. Horn would consent to the Court receiving and viewing the entire video he recorded of his time at the Capitol on January 6, 2021, if the Court believes doing so would assist its resolution of Mr. Horn's motion and resolve any questions it has with respect to Mr. Horn's words and actions on that day.

environment in which Mr. Horn found himself. Stephen Horn, who has consistently maintained he does *not* support the former president and did not vote for him, found himself amidst a crowd of rioters, many of them violent, who shared views far different than those he holds. He had already witnessed supporters of Donald Trump engage in acts of violence and property destruction outside of the Capitol building in just the first few minutes after he had arrived at the grounds. Moreover, having already covered demonstrations and riots in North Carolina, Mr. Horn was acutely aware of the tendency of rioters to target and assault members of the media, especially those not perceived to be in "ideological alignment" with the crowd. In 2020, he witnessed such an incident at one of the first demonstrations he covered, during which rioters assaulted a television news crew outside the Wake County Justice Center in downtown Raleigh, North Carolina.

Thus, while at the Capitol in the midst of rioters who had already shown a propensity for violence, Mr. Horn needed to remain safe and not be discovered as an outsider who was there solely to document the rioters' actions. As Jeremy Lee observes, a journalist's efforts to "not seem[] hostile" to rioters while continuing to "carry[] out [one's] duties to film and document" their actions may sometimes necessitate "blend[ing] in with the crowd," perhaps even joining one of its chants. D.E. 58-6 at 3.

The government's depiction of Mr. Horn's words and actions *after* January 6, 2021, is equally misleading. For example, the government's response gives incomplete context in which Mr. Horn made the following statements:

- "I was on the front lines of the assault on the Capitol."
- "I think defying unconstitutional police orders is pretty brave."

*See* D.E. 70 at 3–4.

4

Upon information and belief, the "front lines" statement was made in response to a comment Mr. Horn received on his Facebook post that included the recording of what he witnessed at the Capitol. The Facebook user to whom it is addressed had claimed that the rioters were antifa, not Trump supporters. Mr. Horn's statement in response to this person was intended to debunk that claim and verify that Trump supporters, not antifa, were responsible for the breach, and his being "on the front lines" of the breach gave him credibility to establish that fact.[2] This statement was *not* meant to imply that he was on the front lines with Trump supporters to riot.

Mr. Horn's "pretty brave" statement was made in Facebook messenger during a private conversation with Monica Ussery. From North Carolina, Ms. Ussery was arrested at the first Reopen NC protest on April 14, 2020, for defying North Carolina Governor Roy Cooper's executive "stay at home" order by gathering to protest that same order. *See* Joe Fisher, *ReOpen NC protester arrested for violating stay-at-home order; sues Gov. Cooper*, WRAL, https://www.wral.com/story/reopen-nc-protester-arrested-for-violating-stay-at-home-order-sues-gov-cooper/20830752/ (April 26, 2023). Though the governor's order never declared protesting to be an exempted "essential activity," the Raleigh Police Department, in response to the growing crowd at the April 14 protest, admonished the crowd to disperse and posted on social media that "[p]rotesting is a non-essential activity." *See id.* Ussery was arrested at the protest and

---

[2] Other journalists made similar statements after covering the Capitol riot. *See, e.g.*, Allison Gordon, *Here's what reporting on the Capitol rioting was like for journalists who were there*, CNN, https://www.cnn.com/2021/01/07/politics/journalists-us-capitol-mob-coverage/index.html (Jan. 7, 2021) (discussing one journalist who "march[ed] with Trump supporters down Constitution Avenue"). *See also* David Bauder, *Journalists recount harrowing attacks amid Capitol riot*, ASSOCIATED PRESS, https://apnews.com/article/donald-trump-new-york-journalists-media-social-media-cba6bd7b93be0ade1da714a32c33d74c (Jan. 8, 2021) (quoting a statement from the National Press Photographers Association that "[t]o do [their] jobs, photojournalists must be on the *front lines* to record the news" (emphasis added)).

charged with criminal offenses for violating the governor's executive order. *See id.* (further noting that she was the "only protester arrested by police for not leaving").

On February 20, 2023, Ms. Ussery's charges were dismissed pursuant to an informal deferred prosecution agreement. *See Ussery v. Cooper, et al.*, No. 5:23-cv-00219-BO-RJ (E.D.NC.), D.E. 11 at 23 (amended complaint). In April 2023, Ms. Ussery sued the governor and other North Carolina officials in the federal Eastern District of North Carolina, alleging they violated her constitutional rights. *See id.* Mr. Horn provides this context to show that his "pretty brave" statement was directed at the actions of Ms. Ussery, *not* his own.

Finally, the government claims that Mr. Horn "was climbing on statues inside the Capitol with scores of rioters disrespecting and causing great destruction to the building." D.E. 70 at 11. There is absolutely *no* evidence that Mr. Horn caused any property damage to the United States Capitol. Quite the opposite and as noted above, Mr. Horn did what he could to prevent the rioters from causing damage. *See supra* at 3 (referencing Mr. Horn's admonishment to an individual in Speaker Pelosi's office to not break objects in the Speaker's office).

*(II) Mr. Horn's Journalism*

The government claims that "[o]n January 6, 2021, the defendant did not have a public facing media presence" and "did not publish, broadcast, or disseminate news." D.E. 70 at 4. But in his interview with the FBI and supplemental submissions through counsel, Mr. Horn has established that he did.

In that interview, Mr. Horn acknowledged that while his personal Facebook page may not have had many "friends," Mr. Horn maintained a separate page, "The Triangle Triangle," which he created and used in 2020 exclusively for publishing news he personally gathered. Below are relevant parts of his interview with the FBI concerning this topic:

- **Stephen Horn**: So I took that video, I posted on . . . before that I started like a Facebook page I called "The Triangle Triangle," like sort of a media outlet thing. I was live posting there some updates like "hey people are getting together," "people are marching". . . I posted, "oh, someone set off a firework, everyone dispersed" . . . so I posted about it on that Facebook page . . . I didn't post the whole thing just posted . . . the clips.

- **FBI Special Agent Craig Noyes**: And, give me that Facebook group again that you were posting this to?

- **Horn**: So, it's a Facebook page, I believe if you go to facebook.com/thetriangletriangle

- **Noyes**: The Triangle Triangle?

- **Horn**: Yes, I believe that will take you there.

- **Noyes**: And you set that up?

- **Horn**: Yes. "The Triangle Triangle." There's like "The Bugle," there's like "the Triangle," as in the area, and "the triangle" as in the instrument; I like to be a little clever sometimes. That is the name I came up with.

- **Noyes**: And how many folks . . . are there followers to that page?

- **Horn**: I think there's around 50 followers now.

- **Noyes**: What were there back then?

- **Horn**: I think that November 3rd was when most of those people started following. I think one of my posts about what was happening, my posts from on the ground, I think was shared by some bigger pages: people saw it and started following.

7

- **Noyes**: And that is still up?

- **Horn**: Yeah. So I posted it, I posted it on Twitter too.

- **Noyes**: What Twitter account is that?

- **Horn**: So it's, let me see if I can remember it . . . so the handle is "Triangle Triangle" with no vows (@TrnglTrngl)

- **Noyes**: How many followers are on there?

- **Horn**: Let's see...I think a couple, which is sort of weird . . . one follower

- **Noyes**: And, so you said the The Triangle Triangle Facebook page has like 50 followers?

- **Horn**: Yeah

- **Noyes**: How many do you have on your personal?

- **Horn**: Like friends?

- **Noyes**: Yeah

- **Horn**: Not very many

- **Noyes**: Can you ballpark it for me?

- **Horn**: I can look it up right now . . . probably like less than a hundred, probably less than fifty, maybe like 20 or something?

- **Noyes**: Okay

- **Horn**: I had livestreamed on my personal Facebook, one of the early ones.

- **Noyes**: That's what I was going to ask.

- **Horn**: I sort of talked to a friend of mine who does more media stuff, I think he used to do some news stuff, and he was like, "hey, it's probably not a good idea to do it on your personal, just so it's not necessarily traced back to you, if you don't

8

want it to be," so I made those videos private, after I had livestreamed. It hadn't really turned out anyway . . . So I had talked to him about it, gotten some tips about distribution and stuff; I guess I wasn't too successful more on the distribution side.

- **Noyes**: In what way? What do you mean?

- **Horn**: If you take footage and you want it to get out to the public, if not that many people see it, then you're not really effectively distributing.

- **Noyes**: I think plenty of people saw your video.

- **Horn**: So he was saying, maybe contact local news and stuff if you get something. I'm not sure when I talked to him, it might have been after the November 3rd one . . . If I get something and other people don't . . . I have a job, I'm not doing it for the money, so if a news station or newspaper want to use it, good, so people can understand what's actually happening.

- **Noyes**: And how long ago did you set up the Facebook, The Triangle Triangle Facebook page?

- **Horn**: Some time last year, I don't remember the date. Probably sometime in the summer, I guess . . . maybe the fall.

- **Noyes**: Have you sold any of your videos, or any of you pictures?

- **Horn**: No.

- **Noyes**: Would you try to sell them? or offer them up, or what?

- **Horn**: I'm just giving them for free, I have a job . . . I understand lots of journalists, like if you're a full time journalist, yeah, you need to make money . . .

9

- **Noyes**: Regarding the January 6th footage?

- **Horn**: Yeah. Maybe I'm doing it wrong, maybe I'm sending it to the wrong people.

so I did contact some news outlets saying, "hey, I have this footage," I didn't hear anything back.

Horn then discussed contacting the FBI. He tried to submit his video online through the FBI's website for tips pertaining to the Capitol riot incident but noted it might have "hung up." He then tried calling the FBI but could not get through on the phone to speak to anyone, so he ended up submitting, on either January 7 or 8, 2021, a general tip on the FBI's website that included a link to his video on Facebook and Rumbler. Mr. Horn later confirmed that the Triangle Triangle Facebook page was still open if Special Agent Noyes wanted to go "take a look."

Other material confirms Mr. Horn was actively engaging in journalism prior to January 6, 2021.[3] In the fall of 2020, Mr. Horn contacted a North Carolina news outlet, "Free Wake," to see if it was "interested in working together to provide live coverage" of a Black Lives Matter event on October 30, 2020, in Raleigh. *See* Exhibit Eight, "Free Wake" Facebook Messages. Mr. Horn informed "Free Wake" that he would be posting updates of that event and another one scheduled for November 3, 2020, on "The Triangle Triangle." *See id.*

Mr. Horn covered and videoed an election protest in Raleigh on November 3, 2020. This video was shared on "The Triangle Triangle." Writing to a friend on Facebook afterwards, he wrote that he was "[i]n Raleigh after reporting on the protest." *See* Exhibit Nine, Facebook Messages with Friend.

---

[3] As discussed in the memorandum in support of the instant motion, Mr. Horn previously submitted this material to the government. *See* D.E. 58 at 6–7.

The government seems to concede, albeit indirectly, that the above activity constituted journalism on the part of Mr. Horn. *See* D.E. 70 at 4 (claiming that Mr. Horn "had not 'reported' any news on Facebook" prior to January 6, 2021, but *limiting* this assertion to the period "[f]rom November 2020 until shortly after the Capitol riot"). While Mr. Horn believes he posted on "The Triangle Triangle" Facebook page multiple times in December 2020, a journalist does not cease being a journalist merely because he/she goes a month without disseminating newsworthy information. Moreover, at that time, Mr. Horn was mainly focused on covering a specific type of event: demonstrations with the strong possibility of turning into riots. The last such incident in his area had occurred in November 2020.

To that end and as previously discussed, Mr. Horn went to the Capitol on January 6, 2021, to cover a Trump rally that could potentially turn into a riot. While there, Mr. Horn sent text messages to his father regarding the reason he entered the Capitol. *See* Exhibit Ten, Horn Texts with Father. Responding to his father's suggestion that being in the Capitol "doesn't seem like a good idea," Mr. Horn stated: "[j]ournalism." *Id.*

Thus, contrary to the government's troubling claim that he was in the Capitol on January 6, 2021, "[f]ilming himself on a rampage"[4] in protest to the results of the 2020 Presidential election, D.E. 70 at 9, the facts show Mr. Horn was there to record and document the event. Moreover, that others were doing so is of no import to the question of whether *he* was engaging in newsgathering activity that day. *See id.* at 4 (suggesting that journalists only "bring[] to light

---

[4] Such language might perhaps be an apt description of Jesus Rivera's conduct on January 6, 2021. *See* Case No. 1:21-cr-00060-CKK, D.E. 62. Rivera was convicted of the four misdemeanors Mr. Horn faces. But unlike Mr. Horn, Rivera returned to Florida and claimed Americans "needed no peaceful transfer of power." *See id.* at 3. Moreover, unlike Mr. Lee, Mr. Baker, and Mr. Horn, Rivera claimed to have "pushed [his] way through the [lines of] riot police," rather than to have *followed* the crowd into the Capitol. *Id.* For these and other reasons, the government's attempt to compare Mr. Horn's case to Mr. Rivera's is unconvincing. *See* D.E. 70 at 8–9.

11

*new* information" (emphasis added)). Many different journalists cover the same events and report the same news, and that is no doubt true with respect to the Capitol riot.

So too is irrelevant the fact that Mr. Horn "is not—and was not—employed as a journalist." *Id.* One's efforts to gather the news need not be compensated in order to constitute journalism. In 2020, Mr. Horn made the conscious decision to publish the journalistic content he was gathering independently, rather than change careers and seek employment with an established media corporation. At the time, Mr. Horn believed the local mainstream media provided insufficient coverage of the riots and demonstrations that were happening in his area. So, in deciding to cover them, Mr. Horn chose to be independent and retain full editorial control of his newsgathering activity.

With respect to Mr. Horn not "possess[ing] any press credentials on January 6, 2021," *see id.*, this Court has previously emphasized that, for purposes of Mr. Horn needing to show uncharged persons with whom he is similarly situated, the "point . . . isn't the credential. The point is what the credential allows." *See* Hearing Tr. 7, *United States v. Stephen Ethan Horn*, No. 1:21-cr-00301-TJK-1 (D.D.C. Oct. 24, 2022). Even so and with respect to his claim of selective prosecution, the uncharged journalists with whom he is similarly situated, Jeremy Lee and Stephen Baker, similarly lacked a credential and thus, by implication, were not allowed to be inside the Capitol that day. *See* D.E. 58-6, 58-7 (affidavits of Jeremy Lee and Stephen Baker).

*(III) The "Similarly Situated" Individuals Requirement*

The government appears to make much of the fact that Jeremy Lee and Stephen Baker are more experienced journalists than Mr. Horn. *See* D.E. 70 at 4 (stating that "[t]here is no indication that, prior to January 6, 2021, [Mr. Horn] was associated with any local or national news outlets"). Specifically, the government argues that "unlike [Mr. Lee and Mr. Baker] who

12

are allegedly associated with newsgathering entities and have experience and capabilities in sharing news on their personal platforms, the defendant proffers no information to suggest that he has ever held a press credential or been otherwise affiliated with a news organization." *Id.* at 10.

Concerning Mr. Horn's experience and capabilities, the information above with respect to Mr. Horn's Facebook page, "The Triangle Triangle," and his pre-January 6 journalistic work disproves this assertion. More importantly though, this Court has already stated that whether a journalist is a "veteran," i.e., "a longstanding journalist," or just "started being a journalist yesterday has [nothing] to do with" the question of whether an individual is engaging in journalism. *See* Hearing Tr. 6, *United States v. Stephen Ethan Horn*, No. 1:21-cr-00301-TJK-1 (D.D.C. Oct. 24, 2022) (further stating that "whether [a journalist] work[s] for a fancy news organization or [he] blogs from [his] home" also has no bearing on that question).

The government correctly notes that Mr. Horn, once inside the Rotunda, "stood on the base of a monument, recording on his cell phone." *See* D.E. 70 at 2. His doing so is accurately captured by the picture from an Instagram post set forth on page 3 of the government's response. Though the government seems to suggest this fact aggravates Mr. Horn's situation and/or sets him apart from the uncharged journalists, Mr. Baker writes that he similarly "utilize[ed] empty spaces or benches [in the Capitol] to get optimal camera angles." *See* D.E. 58-7 at 3 (affidavit of Stephen Baker). As such, the fact that Mr. Horn used his surroundings to enhance his journalistic efforts that day actually supports the conclusion that he is similarly situated to the uncharged journalists.

With respect to Mr. Lee, the government discusses the "journalistic protocol" he followed with respect to the Capitol riot. *See* D.E. 70 at 11 (discussing Mr. Lee's affidavit and how he did

not stop "at least one of [his] cameras" during his time in the Capitol). Mr. Horn did the same thing, and in previous filings, the government has acknowledged that Mr. Horn posted the continuous, approximately two-hour long video to his Facebook page.[5] *See, e.g.*, D.E. 1-1 at 3 (statement of facts in support of probable cause); D.E. 37 at 3 (response in opposition to Mr. Horn's prior motion to modify conditions of release).

Additionally, Mr. Horn's recording equipment that he took to the Capitol sets him in line with Mr. Lee and Mr. Baker. With respect to the helmet camera, Mr. Horn spent 40-plus hours assembling, building, and programming this device for the sole purpose of capturing and publishing video journalism. Moreover, nothing about his use of a cell phone sets him apart from other mainstream media and independent journalists who covered the Capitol riot. The modern smartphone is an incredible journalistic tool, allowing one to both capture photos and videos and then directly publish material. Mr. Horn purchased this smart phone for the purpose of capturing photos and videos for journalistic endeavors, and this phone served as his "back up journalistic equipment" for that day.[6] *See* D.E. 70 at 11.

Finally, the government appears to argue that, even if the Court found Mr. Horn to be similarly situated to Mr. Lee and Mr. Baker, Mr. Horn's claim of selective prosecution should still be denied because the government *may* end up charging Mr. Lee and Mr. Baker for their conduct on January 6, 2021, which would obviously foreclose any showing Mr. Horn has made that others with whom he is similarly situated have not been charged. *See id.* at 9 n.2 (stating that "the fact that the government has not yet brought criminal charges against a particular person

---

[5] The government states that "[w]ithin about a month of January 6, 2021, the defendant's Youtube broadcast channel had less than 100 followers." D.E. 70 at 4. But at the time, Mr. Horn was not publishing journalistic content through his YouTube channel. His first YouTube video was not published to this channel until May 2021.
[6] Mr. Horn had a separate flip phone he used for personal and professional matters.

14

does not lead to the conclusion that the person is immune from such charges" and that "the government's investigation is ongoing, and new charges are brought against known individuals frequently"); *id.* at 12 (stating that "the defendant's effort to claim disparate treatment in comparison to an ever-extending sample size is unsupportable").

American courts make decisions based on known, established facts and evidence that are introduced into the record for a given case, *not* facts outside of the record or hypothetical, unknown scenarios that might develop in the future. *See DeMarco v. United States*, 415 U.S. 449, 450, n. (1974) ("factfinding is the basic responsibility of district courts, rather than appellate courts"). *See also, e.g.*, *Protect Our Water v. Cnty. of Merced*, 110 Cal. App. 4th 362, 364, 1 Cal. Rptr. 3d 726, 726 (2003) (stating, for purposes of the appellate process, "if it is not in the record, it did not happen"). As of the date of this filing, the similarly-situated individuals, Mr. Lee and Mr. Baker, remain uncharged for their activity at the Capitol on January 6, 2021. That is an established fact this Court may find and rely upon in resolving Mr. Horn's selective prosecution claim. That these individuals *may* be charged in the future is an unknown, purely speculative fact that should not factor into the Court's resolution of Mr. Horn's instant motion.

*(IV) The "Improper Motivation" Requirement*

Rather than arguing Mr. Horn has failed to show evidence of an improper purpose in charging him but not Mr. Lee and Mr. Baker, the government merely states that Mr. Horn has relied upon "insinuation and inference" in doing so. *See* D.E. 70 at 13. But since "[d]irect evidence of that purpose is rarely available, . . . courts permit defendants to use statistical disparities and other indirect evidence to show intent." *Judd*, 579 F. Supp. 3d at 4. An inference is "a conclusion or opinion that is formed because of known facts or evidence" or "the act of passing from statistical sample data to generalizations (as of the value of population parameters)

15

usually with calculated degrees of certainty." *See* "Inference," Merriam-Webster.com, accessed Aug. 4, 2023, available at https://www.merriam-webster.com/dictionary/inference.

Here, the government has resisted Mr. Horn's efforts to obtain direct evidence regarding its decision to single him out for prosecution as opposed to others similarly situated. *See* Exhibit Four. To show its purpose in doing so was improper and for reason(s) forbidden by the Constitution, Mr. Horn is left to rely upon indirect evidence. This indirect, statistical evidence is as follows: two individuals who are similarly situated to Mr. Horn "in all *material* ways" have not been prosecuted for doing the *same thing* he did on January 6, 2021. *See* Hearing Tr. 5, *United States v. Stephen Ethan Horn*, No. 1:21-cr-00301-TJK-1 (D.D.C. Oct. 24, 2022) (emphasis added). A "logical conclusion or opinion that is formed" from these known facts is that the government has prosecuted Mr. Horn for arbitrary reason(s) that are forbidden by the Constitution. As decisions to prosecute may not be "based on an unjustifiable standard such as race, religion, or other arbitrary classification," *Armstrong*, 517 U.S. at 464 (citation and quotation marks omitted), this Court should dismiss the charges.

*********************************

## CONCLUSION

Mr. Horn believes that, *at the very least*, he has adduced "some evidence of prong one" and "some evidence of prong two" to establish a claim of selective prosecution. *See* Hearing Tr. 5, *United States v. Stephen Ethan Horn*, No. 1:21-cr-00301-TJK-1 (D.D.C. Oct. 24, 2022). He moves the Court to dismiss the charges on that basis or, in the alternative, to order the government to "assemble from its own files [any material] which might corroborate or refute [his] claim" of selective prosecution. *Armstrong*, 517 U.S. at 468. *See also* Hearing Tr. 8, *United States v. Stephen Ethan Horn*, No. 1:21-cr-00301-TJK-1 (D.D.C. Oct. 24, 2022) (suggesting that Mr. Horn's prospects of proving selective prosecution would improve if he could "present . . . the case of someone truly similarly situated who wasn't prosecuted").

Respectfully submitted this 4th day of August, 2023.

*/s/ Marshall H. Ellis*
MARSHALL H. ELLIS
Hornthal, Riley, Ellis & Maland, LLP
301 East Main Street
Elizabeth City, NC 27909
Telephone: 252-335-0871
Fax: 252-335-4223
Email: mellis@hrem.com
N.C. State Bar No. 47720
Retained Counsel for the Defendant

*/s/ Charles R. Haskell*
Charles R. Haskell
LAW OFFICES OF CHARLES R. HASKELL, P.A.
641 Indiana Ave. NW
Washington, DC 20004
(202) 888-2728
Email: charles@charleshaskell.com
DC Bar No. 888304007
Retained Counsel for the Defendant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

Ashley Akers
DOJ-CIV
Commercial Litigation Branch
1100 L Street Northwest
Washington, DC 20530
(202) 353-0521
Email: ashley.akers@usdoj.gov

Sonia Williams Murphy
DOJ-CIV
Civil Division - Commercial Litigation Branch
1100 L Street NW
Washington, DC 20530
202-305-3067
Email: sonia.murphy@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on August 4, 2023, using the CM/ECF system which will send notification of such filing to the above.

    This the 4th day of August, 2023.

                                      ***/s/ Marshall H. Ellis***
                                      MARSHALL H. ELLIS
                                      Hornthal, Riley, Ellis & Maland, LLP
                                      301 East Main Street
                                      Elizabeth City, NC 27909
                                      Telephone: 252-335-0871
                                      Fax: 252-335-4223
                                      Email: mellis@hrem.com
                                      N.C. State Bar No. 47720
                                      Retained Counsel for the Defendant


                                      ***/s/ Charles R. Haskell***
                                      CHARLES R. HASKELL
                                      LAW OFFICES OF CHARLES R. HASKELL, P.A.
                                      641 Indiana Ave. NW
                                      Washington, DC 20004
                                      (202) 888-2728
                                      Email: charles@charleshaskell.com
                                      DC Bar No. 888304007
                                      Retained Counsel for the Defendant