**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**NO. 1:21-CR-00301-TJK-1**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND INCORPORATED MEMORANDUM OF LAW** |
| **v.** | |
| **STEPHEN ETHAN HORN,** | |
| *Defendant.* | |

In federal courts, "the application of the beyond-a-reasonable-doubt standard to the evidence [admitted at a criminal trial] is *not* irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 318 n.10 (1979) (emphasis added). For this reason, Rule 29 of the Federal Rules of Criminal Procedure provides that a court, either on its own or on the defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). Here, because the evidence introduced at Mr. Horn's trial is insufficient to sustain convictions for any of the four crimes with which he was charged, Mr. Horn persists in his request for the Court to enter judgments of acquittal as to each of those offenses.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 13, 2021, Mr. Horn was named in a four-count information charging him with four misdemeanor offenses: (i) entering and remaining in a restricted building, in violation of 18 U.S.C. § 1752(a)(1); (ii) disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. § 1752(a)(2); (iii) violent entry and disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) parading, demonstrating, or picketing in a

Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).[1] The charges stem from events that took place at the United States Capitol on January 6, 2021.

Prior to trial, Mr. Horn moved to dismiss his charges due to selective prosecution, but the Court denied this motion for reasons stated on the record at a pretrial conference held on August 28, 2023. *See* ECF No. 76. A jury trial of these matters commenced on September 13, 2023.

The government's case-in-chief consisted of the testimony of three witnesses and a total of 73 exhibits, including a stipulation of the parties. Capitol Police Lieutenant George McCree testified first on behalf of the government. Among other things, Lieutenant McCree testified about the closure of the United States Capitol and its grounds on January 6, 2021, and the various reasons for which particular areas were closed, e.g., COVID-19, the upcoming Presidential Inauguration ceremony, and scheduled demonstrations on the grounds for which permits had been issued. He also testified about the added security measures that were in place due to the joint session of Congress scheduled for that day.

Lieutenant McCree then testified to the events that unfolded later that day, to wit: the breach of the Capitol building and its grounds by supporters of former President Trump. Lieutenant McCree was assigned to the House Chamber when the breach occurred, and since the doors to that chamber were closed after Capitol Police decided to lock it down, he personally never saw any of the rioters while inside the building. Even so, Lieutenant McCree testified that everyone in the crowd, regardless of whether they were actually protesting and/or rioting, was responsible for hampering the ability of his agency to perform its job of securing the Capitol because each person had to be removed from the building.

---

[1] On February 25, 2022, the government filed a superseding criminal information that amended the wording of the charged counts but did *not* alter the substance of these charges. *See* D.E. 41.

As to Mr. Horn, Lieutenant McCree acknowledged that he had no personal interactions with Mr. Horn on January 6, 2021. In fact, prior to meeting with the government to prepare for trial in the weeks prior to September 13, 2023, Lieutenant McCree admitted that he had no personal knowledge of Stephen Horn or what he did or did not do on January 6, 2021. In sum, Lieutenant McCree's testimony primarily focused not on the actions of Stephen Horn on January 6, 2021, but rather the effect that the rioters as a whole had on Lieutenant McCree's agency's ability to secure the Capitol building and protect Congress.

The government then called Metropolitan Police Officer Valerie Patete to testify. On January 6, 2021, Officer Patete and other members of her agency had been summoned to assist Capitol Police with its efforts to re-secure the Capitol Building after the breach. She was specifically assigned to assist with an area of the Rotunda near the Abraham Lincoln statue. In doing so, rioters engaged her and other police officers with physical contact and abusive language. *See* Government's Exhibit 608.

It is undisputed that Mr. Horn was *not* one of the protesters who personally engaged Officer Patete and her fellow officers. Instead, and consistent with his story from day one, Mr. Horn stood above the crowd on the Lincoln statue and recorded the entire exchange as part of his effort to document the events of that day. *See* Government's Exhibits 608, 603. Even so, Officer Patete testified that she considered Mr. Horn and everyone else there just as much of a threat to her and her fellow officers as the individuals who actually engaged the officers.

Special Agent for the Federal Bureau of Investigation (FBI), Craig Noyes, was the last witness who testified on behalf of the government in its case-in-chief. Through Agent Noyes, Mr. Horn's two-hour long video recording of his time at and inside the Capitol on January 6, 2021, was admitted, and portions of it were played for the jury. Agent Noyes summarized his

investigation of Mr. Horn's case, beginning with how he first learned of Mr. Horn being at the Capitol through multiple tips submitted to the FBI, including ones that referenced seeing Mr. Horn's video of the Capitol breach after he had posted it to his Facebook page. One of these tips, Agent Noyes later acknowledged, included Mr. Horn's own submission to the FBI, which included an offer to share his video with the FBI in hopes it could assist them with their investigative efforts regarding January 6, 2021.

Special Agent Noyes discussed his interview of Mr. Horn in February 2021 and how Mr. Horn, whose undersigned attorney was present, was completely forthright and honest about being at the Capitol on January 6, 2021. Agent Noyes then testified regarding his interpretation of specific incidents captured in Mr. Horn's video at the Capitol, Government's Exhibit 505, including where Mr. Horn joined a "USA!" chant. On cross-examination, Agent Noyes agreed there were many other chants going on around Mr. Horn throughout that video and that Mr. Horn never joined "Stop the Steal!" or "Whose House? Our House!" chants.

Agent Noyes also testified that he obtained a search warrant for Mr. Horn's Facebook records and that those records included information that confirmed Mr. Horn was a member of Facebook groups like "Stop the Steal NC" and "Mask Off America." *See* Government's Exhibit 501. The same records confirmed that Mr. Horn had protested, in North Carolina, an abortion clinic and the arrest of a store owner for refusing to enforce a mask mandate during the pandemic. Conspicuously missing from those records, however, was any mention of Mr. Horn planning to protest in Washington, DC, on January 6, 2021, and Agent Noyes confirmed that no such information was found in Mr. Horn's Facebook records.

After Agent Noyes testified, the government rested, and Mr. Horn moved for a Rule 29 judgment of acquittal as to all counts. On the record on September 14, 2023, the Court denied

this motion, but at an October 11, 2023, status conference, the Court clarified that it intended to reserve ruling on this motion at the time it was made, rather than initially deny it.

The third day of trial, September 15, 2023, began with Mr. Horn testifying on his own behalf. Consistent with what he told Agent Noyes, Mr. Horn told the jury that he went to Washington, DC, on January 6, 2021, to experience a Trump rally, sensing it might be the last chance to see one. While there, things got out of hand, and the Trump supporters started acting unruly. From his experience in covering riots as an independent journalist, Mr. Horn sensed things were amiss.[2] At that point, he began recording what he was witnessing with a helmet camera he had built specifically for the purpose of covering newsworthy riots.

Mr. Horn then took the jury through everything he did and thought as he entered the Capitol building and its grounds on January 6, 2021. He testified that he did not know Congress was meeting inside the Capitol that day to certify the results of the 2020 Presidential Election, that this joint meeting was the reason the Capitol building closed, or that the Vice President was present in the rare exercise of his constitutional role as President of the Senate. Nor was he aware that the "Area Closed" signs posted around the Capitol were erected by Capitol Police to close off areas reserved for permitted demonstrations, as Lieutenant McCree had earlier testified.

Mr. Horn testified that even though he certainly saw indicators that suggested entering the Capitol building was not permissible for the rioters, he explained that it never crossed his mind that an independent journalist such as himself, who was not part of the protest, was prohibited from entering the building to document what was happening. He testified that he personally knew of many journalists who did just that on January 6, including Ashley Gilbertson, the photographer for the New York Times Magazine who captured the picture of Mr. Horn

---

[2] Mr. Horn spent time telling the jury about his background in journalism, particularly how he sensed a need for more coverage of riots and protests that were occurring in North Carolina during 2020.

introduced as Government's Exhibit 603. *See also* Government's Exhibit 608 at 2 minutes, 13 seconds in (showing Gilbertson engaging in the same activity as Mr. Horn—i.e., journalism— right across the entryway from Mr. Horn).

Mr. Horn then explained various portions of his video (Government's Exhibit 505) to the jury. Mr. Horn acknowledged that he joined a "USA!" chant but that his decision to do so was entirely based on the environment in which he found himself. Close in time to joining the chant, Mr. Horn explained an incident captured in the video where an individual was threatening to use a flagpole as a weapon against police officers. Wanting to protect himself and others, Mr. Horn grabbed the end of the flagpole, and the man proceeded to curse at Mr. Horn and physically threaten him. Thus, as Mr. Horn explained to the jury, he felt joining the chant was necessary at that point in order to not be revealed as an outsider to the rioters.

Mr. Horn also discussed the scene from the video where he cautioned an individual not to break an award given to Speaker Pelosi while he was in her office. Outside of her office, he picked up American flags that had fallen so they would not be touching the floor. While outside on the east side of the building, he rendered to First Aid to a woman who had been injured, and he picked up eyeglasses belonging to another woman who had dropped them. While listening to the speeches outside the Capitol, a protester asked Mr. Horn if he too had "had enough" of the way things were going in the country. In response, Mr. Horn laughed at her.

In sum, Mr. Horn testified that he went into the Capitol on January 6, 2021, as a journalist to document and record the events. He testified that he does not support former President Trump and did not vote for him in either 2016 or 2020. While his politics could certainly be described as conservative and election integrity/reform is a cause he supports, Mr.

Horn told the jury he would never endorse or participate in an effort to thwart the peaceful transition of power from one presidential administration to the next.

During cross-examination, the government attempted to undermine Mr. Horn's background as a journalist and establish that he went to the Capitol on January 6 as just another protester supporting the "Stop the Steal" movement. To rebut this claim, Horn sought to introduce a statement he made the night of the incident before the FBI had arrested anyone for that day's events which asserted he went to the Capitol on January 6, 2021, for purely journalistic reasons, consistent with his trial testimony. *See* Defendant's Exhibit Five, "Horn's Facebook Post that accompanied his J6 video." *See also* FED. R. EVID. 801(d)(1)(B)(i) (providing that a statement "consistent with the declarant's testimony" is not hearsay if offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying"). The Court sustained the government's objection to its admission.

As such, the only other evidence comprising Mr. Horn's case-in-chief was the testimony of his father, Dan Horn. Mr. Horn's father testified that Stephen was a college graduate and worked for his father's software business in Wake Forest, North Carolina. Consistent with his son's testimony, Dan confirmed that the Horns hold conservative political views but that neither Stephen nor anyone else in their family supported former President Trump and that they would view doing so as morally prohibited, given their opinion that the former president is a "liar."

Dan Horn corroborated Stephen's testimony regarding Stephen's background and development as a journalist. Dan specifically discussed Stephen's coverage of the 2020 riots in North Carolina and how coverage of that type of event was turning into a passion for Stephen. Dan also told the jury that his son had requested permission to go to Washington, DC on January

6 by banking extra hours at work ahead of time. Dan testified that after his son had entered the Capitol building on January 6, he told Stephen it probably was not a good idea to go inside the building. Finally, Dan testified that as Stephen has matured and grown older, he knows his son to be a truthful person.

After Dan Horn testified, the defense rested and again moved for a judgment of acquittal on all counts pursuant to Rule 29. This time, the Court unequivocally reserved ruling on the motion. The government then called one rebuttal witness, Michael Mastrian, who is the Senate Radio and Television Correspondents Gallery Director. Mr. Mastrian described the process a journalist would typically follow to obtain credentials to cover events at the Capitol and testified that he had no record of Stephen Horn or his media platform, "The Triangle Triangle," ever having applied for such credentials with respect to the Senate. Mr. Horn had no questions for Mr. Mastrian.

The Court proceeded to instruct the jury, and closing arguments were made on behalf of each party. The jury returned for a fourth day of trial to deliberate on September 18, 2023, and after approximately 80 minutes, it announced it had reached a verdict, which was "guilty" as to each count. ECF at 85, 87. Mr. Horn again renewed his motion for a judgment of acquittal on all counts pursuant to Rule 29, and the Court reserved its ruling and requested briefing as to the motion. In support thereof, Mr. Horn now states as follows:

## II. ARGUMENT

Rule 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). "The court may reserve decision on the motion, proceed with the trial (where the motion is made

before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." FED. R. CRIM. P. 29(b). But, "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id.*

In ruling on a motion for judgment of acquittal, the standard is "whether, viewing the evidence most favorably to the government and according the government the benefit of all legitimate inferences therefrom, a reasonable juror must necessarily have had a reasonable doubt as to the defendant['s] guilt." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). "[T]he trial court may take the case from the jury 'only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985) (citing *United States v. Davis*, 562 F.2d 681, 683 (D.C. Cir. 1977) (per curiam)). Recognizing that "the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion," *Jackson*, 443 U.S. at 318 n.10, the rule exists to test "the sufficiency of the evidence against defendant" and serves to eliminate "the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of guilt." 2A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 461 (4th ed. 2008).

As to each of the four crimes with which Mr. Horn was charged, there is insufficient evidence upon which a reasonable mind might fairly be convinced of Mr. Horn's guilt beyond a reasonable doubt. For starters, the fact that the jury deliberated a mere 80 minutes undoubtedly suggests it did not properly evaluate the evidence that was introduced in his trial and whether it satisfied the beyond-a-reasonable-doubt standard as to *every* element of *each* charge. *See, e.g.*, *United States v. Cunningham*, 108 F.3d 120, 124 (7th Cir. 1997) (stating that, while "brief

deliberation cannot, alone, be a basis for an acquittal . . . , it is a factor to be considered when deciding a motion for a new trial"). The central piece of evidence in the trial, Mr. Horn's video (Government's Exhibit 505), is 40 minutes longer than the time it took the jury to deliberate *all* the evidence introduced during the entire trial. But, even if the jury did analyze this video and the other evidence, there is insufficient evidence upon which a reasonable mind might fairly conclude Mr. Horn committed every element of each crime beyond a reasonable doubt.

*(A) Count One – Entering or Remaining in a Restricted Building or Grounds*

Count One charged Mr. Horn with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). To find him guilty of that offense, the Court instructed the jury that it needed to find the government proved two elements beyond a reasonable doubt: (1) that he "entered or remained in a restricted building or grounds without lawful authority to do so;" and (2) that he "did so knowingly, meaning that the defendant knew the building or grounds were restricted and he knew he lacked lawful authority to enter or remain there." ECF No. 82 at 10.

Though the Court defined "restricted building or grounds" for the jury, *id.* at 11, the Court did *not*, over Mr. Horn's objection, instruct the jury that it must find that the government proved, beyond a reasonable doubt, that Mr. Horn specifically knew the building and its grounds satisfied the statutory definition of "restricted" in that it was closed because "the President or other person protected by the Secret Service [was] or w[ould] be temporarily visiting." § 1752(c)(1)(B). As explained herein, Mr. Horn persists in his argument that the Court should have instructed the jury that the government was required to prove Mr. Horn knew the area he entered was "restricted" due to that specific reason, as opposed to just generally knowing that the area was restricted in the ordinary use of that term. *Compare* § 1752(c)(1) (defining "restricted

buildings or grounds") *with* "Restricted," Merriam-Webster.com, accessed Oct. 27, 2023,

available at https://www.merriam-

webster.com/dictionary/restricted#:~:text=a,groups%20or%20specifically%20excluding%20othe

rs (defining "restricted" as "available to the use of particular groups or specifically excluding

others"). But, even under the Court's instructions as given to the jury, there are two separate

reasons the government's evidence still should have left a reasonable juror having reasonable

doubt as to Mr. Horn's guilt of Count One.

> (1) The "knowingly" element applies to the area's status as a "restricted
> building or grounds."

Section 1752(a)(1) criminalizes "knowingly enter[ing] or remain[ing] in any restricted

building or grounds without authority to do so." Thus, in addition to proving that the area entered

has the status of a "restricted building or grounds," Congress has required that the accused know

that status. Congress has set forth two requirements for an area to qualify as a "restricted

building or grounds": (i) it must be a posted, cordoned off, or otherwise "restricted area"; and (ii)

it must fall into one of three categories – (A), (B), or (C) – that Congress has identified as

warranting special protection, one of which is that a Secret Service protectee is visiting. §

1752(c).

Interpreting this statute, Mr. Horn requested that the Court instruct the jury that it must

find the following three elements beyond a reasonable doubt in order to convict Mr. Horn of

Count One:

> First: that the defendant knowingly entered or remained in a
> restricted building or grounds, which is any posted, cordoned off,
> or otherwise restricted area of a building or grounds where a
> person protected by the Secret Service was or
> would be temporarily visiting;

> Second: *that the defendant knew such building or grounds were posted, cordoned off, or otherwise restricted because a person protected by the Secret Service was or would be temporarily visiting*; and
>
> Third: that the defendant did not have lawful authority to make such entry or remain.

ECF No. 72-2 at 34 (emphasis added).

Rejecting this request, the Court later instructed the jury that it need only find that Mr. Horn "knew the building or grounds were restricted." ECF No. 82 at 10.

Mr. Horn maintains that the Court was required to instruct the jury that it must prove not only that Mr. Horn entered a "posted, cordoned off, or otherwise restricted area," but also that he knew that the area was "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." *See United States v. Isaac Steve Sturgeon*, No. 1:21-cr-00091-RCL at ECF No. 163 (citing § 1752(c)(1)(B)). *See also United States v. Griffin*, No. 22-3042 (D.C. Circuit) (case on appeal presenting the same question).[3] Because the government's evidence fell short of proving, beyond a reasonable doubt, that Mr. Horn knew such a person was or would be visiting the Capitol that day, the Court should enter a judgment of acquittal as to Count One.

### (2) The government's evidence failed to establish that the Capitol and its grounds constituted a "restricted building or grounds," as defined by § 1752(c)(1)(B).

Even if the Court were not required to instruct the jury that Mr. Horn must have known the President or another person protected by the Secret Service was or would be temporarily visiting the Capitol on January 6, the government still failed to prove a violation of § 1752(a)(1) from the evidence it presented on the elements the jury was told to find in order for Mr. Horn to

---

[3] Oral argument in this matter has been scheduled for December 4, 2023.

be guilty of that offense. In short, the government's evidence never definitively established that the Capitol and its grounds constituted a "restricted building or grounds," as defined at § 1752(c)(1)(B).

The Court instructed the jury that "[t]he term 'restricted building or grounds' means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting" and that a "'person protected by the Secret Service' includes the Vice President, and the immediate family of the Vice President." ECF No. 82 at 11. At trial, the government attempted to establish the area Mr. Horn entered and remained constituted such "restricted building or grounds" primarily through the testimony of Lieutenant McCree and a number of exhibits admitted through him. *See* Government's Exhibits 202, 217 (Capitol Police Board Order and Press Release announcing the closure of the West Front of the Capitol "to facilitate Inaugural preparations" by "allow[ing] for the safe and secure construction of the Inaugural platform, stands, and other infrastructure necessary to support the" 59th Presidential Inauguration on January 20, 2021). *See also* Government's Exhibits 205, 207, 211–13 (pictures showing "Area Closed" signs posted by the United States Capitol Police Board and other barriers Capitol Police had erected to close the area).

Lieutenant McCree testified that the Capitol and its grounds were closed on January 6, 2021, for a variety of reasons, including: (i) preparations for the Inauguration; (ii) demonstrations by political groups who had properly obtained permits beforehand; and (iii) the coronavirus pandemic. According to Lieutenant McCree, not every part of the Capitol and its grounds were closed for the same reason. For example, the building itself was closed due to the

pandemic while the West Front grounds were closed to accommodate plans for the Inauguration and the permitted demonstrations.

While Lieutenant McCree also testified about the certification of the electoral college vote that was to take place that day and the additional security measures that were in place for that vote, it was clear from his testimony that his agency did *not* close the Capitol building and its grounds for that specific reason. He testified that the building had already been restricted due to the pandemic. Additionally, he testified that the barriers, fencing, and signs his agency had erected outside of the Capitol that day had nothing to do with assisting the Secret Service's protection of Vice President Pence's visit to the Capitol and were in place for other reasons, i.e., the Inauguration and scheduled demonstrations.

Thus, while the government may have proven, through Lieutenant McCree's testimony, the aforementioned exhibits, and the parties' stipulations (Government's Exhibit 800), that the Capitol and its grounds were closed to the public on January 6, 2021, it failed to prove that these areas were "restricted buildings or grounds," as defined at § 1752(c)(1)(B). Under that statute, "restricted buildings or grounds" constitute areas that have been closed or "otherwise restricted" specifically because "the President or other person protected by the Secret Service is or will be temporarily visiting" it (or that have been closed for either of the other two specific reasons listed in (c)(1)(A) and (c)(1)(C)). Areas or buildings that were closed due to the coronavirus pandemic, planning for the Inauguration, or permitted political demonstrations do *not* constitute "restricted buildings or grounds" under § 1752(c)(1).

For this reason and regardless of what Mr. Horn did or did not know on January 6, 2021, the government failed to present sufficient evidence that Mr. Horn physically entered or

remained in "restricted buildings or grounds," i.e., areas that were closed specifically because the Vice President was or would be temporarily visiting.

<u>(3) The government's evidence failed to establish that Mr. Horn knew he lacked lawful authority to enter and remain in the Capitol and its grounds.</u>

Finally, a third reason the Court should enter a judgment of acquittal as to Count One is that the government failed to prove Mr. Horn "knew he lacked lawful authority" to enter and remain in the Capitol and its grounds. ECF No. 82 at 10. As he has said from the beginning, Mr. Horn went into the Capitol and on its grounds on January 6, 2021, as a journalist. To discredit his story, the government presented evidence that there were, in fact, "legitimate" journalists inside the Capitol reporting the events as they transpired. *See* Government's Exhibits 615 (Quotidien journalist inside the Capitol); 617 (ITV News's Robert Moore reporting from outside steps of Capitol). Other evidence of journalists inside the Capitol that day was also admitted during the trial. *See, e.g.*, Government's Exhibits 603, 608 (exhibits showing Ashley Gilbertson and his close proximity to Mr. Horn on January 6, 2021).

Mr. Horn saw these individuals engaging in journalistic activity inside and around the Capitol on January 6, 2021. Thus, as a journalist himself, he naturally thought there was no problem with him doing the same thing, and he told the jury just that during his testimony. In short, he believed his authority to enter the Capitol and document what was happening was no less than that of the other journalists who were doing the same thing.

To be sure and had he been a more seasoned, veteran journalist at that point, perhaps he would and should have thought of the need to be credentialed before entering the building. But, again, the government's burden on this element of Count One was to prove, beyond a reasonable doubt, that Mr. Horn "knew he lacked lawful authority to enter or remain there." ECF No. 82 at 10. As a 22-year-old with less than a year's worth of journalistic experience as of January 6,

2021, his youth and inexperience no doubt contributed to what he did know (that it was "ok" to go into the Capitol as a journalist since there were other journalists doing just that) versus what he should have known (that those journalists probably have credentials that allow them to go inside a highly-secured building like that on a regular basis). For this reason, the Court should find that the government failed to carry its burden of proving, beyond a reasonable doubt, that Mr. Horn knew he lacked lawful authority to enter and remain in the Capitol and its grounds.

In sum, Mr. Horn asks the Court to enter a judgment of acquittal as to Count One for any of these three reasons. First, the government failed to prove Mr. Horn specifically knew the building and its grounds were restricted because "the President or other person protected by the Secret Service [was] or w[ould] be temporarily visiting," as required by § 1752(c)(1)(B). Second, the government failed to prove that the areas Mr. Horn entered and remained in were specifically closed or restricted because the Vice President was or would be temporarily visiting them, regardless of what Mr. Horn knew. Third, the government failed to prove Mr. Horn knew that he lacked lawful authority to enter those areas as a journalist. The evidence introduced by the government on each of these three points would lead a reasonable juror to have reasonable doubt as to whether the government proved Count One, and as such, a judgment of acquittal on that count is appropriate.

### (B) Count Two – Disorderly or Disruptive Conduct in a Restricted Building or Grounds

As to Count Two, the Court instructed the jury that it could only find Mr. Horn guilty if the government proved three elements beyond a reasonable doubt. *See* ECF No. 82 at 13–14. First, Mr. Horn "engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds." Second, that Mr. Horn "did so knowingly, and with the intent to impede or disrupt the orderly conduct of government business or official functions." And third, that Mr.

Horn's conduct "in fact impeded or disrupted the orderly conduct of government business or functions."

As to the first element, which requires the Defendant's conduct to have occurred in a "restricted building or grounds," Mr. Horn incorporates by reference the argument he made as to Count One regarding why the Court must enter a judgment acquittal due to the government's failure to prove Mr. Horn ever physically entered "restricted building or grounds," as specifically defined by § 1752(c)(1)(B). With respect to conduct beyond mere presence, as required by the second and third elements of Count Two, the Court instructed the jury that "disorderly conduct" is "conduct that tends to disturb the public peace or undermine public safety" and that "disruptive conduct" is "a disturbance that interrupts an event, activity, or the normal course of a process."

From the evidence introduced at trial, which was largely undisputed by Mr. Horn, it is hard to imagine how the jury concluded that Mr. Horn ever personally engaged in conduct that was "disruptive," "disturbed the peace," or "undermined public safety." The video of his time at the Capitol, Government's Exhibit 505, shows a peaceful, soft-spoken young man who encouraged people to not be violent and to not destroy property. Outside of Speaker Pelosi's office, Mr. Horn picked up American flags that had fallen and re-erected them in their holders so they would not be touching the floor. And rather than undermine public safety, Mr. Horn rendered first aid to a woman on the East Side steps who was injured and picked up the glasses of another woman who had dropped them.

While he did participate in a "USA!" chant, the manner and context in which he did so at least cast a reasonable doubt that such conduct "disturb[ed] the public peace" or constituted "a disturbance that interrupt[ed] an event, activity, or the normal course of a process." In the Crypt,

17

Mr. Horn was surrounded by violent rioters who were out of control. One such rioter was about to use a plastic flagpole as a weapon, and by confronting the man, Mr. Horn was able to prevent this imminent violence from occurring. After he did so, the angry rioter cursed and physically threated Mr. Horn. A reasonable juror would have properly considered these circumstances in which Mr. Horn joined the chant—and how he abstained from joining so many others that were captured in Government's Exhibit 505—to conclude that there is a reasonable doubt as to whether Mr. Horn engaged in "conduct that tends to disturb the public peace" or "a disturbance that interrupts an event, activity, or the normal course of a process."

As to Count Two's second element, *no evidence* was presented that Mr. Horn "had the intent to impede or disrupt the orderly conduct of government business or official functions." Agent Noyes confirmed that, in Mr. Horn's Facebook records, there was no information that indicated Mr. Horn went to Washington, DC on January 6, 2021, for the specific purpose of participating in an attempt to thwart the certification of the electoral college vote. Mr. Horn testified that he was not even personally aware that the vote was taking place inside the Capitol that day. And again, his words and actions captured in Government's Exhibit 505 corroborate that he had no intent to thwart the certification of the electoral college vote.

The third element required the government to prove that Mr. Horn's "conduct in fact impeded or disrupted the orderly conduct of government business or official functions." To prove this element, Lieutenant McCree and Officer Patete testified that, regardless of who they specifically encountered or what they knew about each individual inside the Capitol, every unauthorized person inside the building that day affected law enforcement's ability to do its job, i.e., secure the Capitol building. But this testimony is not probative, let alone proof beyond a

reasonable doubt, of Mr. Horn's own individual conduct and how that conduct did or did not impede or disrupt the orderly conduct of government business.

Recognizing that this theory of collective guilt by association was insufficient for the government to prove this Count, the Court instructed the jury that "evidence that the defendant merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offense is not enough for you to find the defendant guilty," even as an aider and abettor. ECF No. 82 at 15–16. In other words, the government had to prove that specific conduct on the part of Mr. Horn actually impeded or disrupted government business.

Even if one were to conclude that Mr. Horn's act of participating in the "USA!" chant constituted disorderly or disruptive conduct, which Mr. Horn does not concede, consider that Mr. Horn's doing so took place in the Crypt, which is *very* far away from the Senate and House Chambers. No evidence was presented that a person screaming "USA!" at the top of his/her lungs in the Crypt could have or actually did disrupt the proceedings in either chamber. Instead, Lieutenant McCree testified that the certification proceedings had been paused due to the physical breach itself, rather than disruptive noise made after the breach. Conduct cannot "in fact impede or disrupt" a proceeding which had already been disrupted on other grounds.

For these reasons, a reasonable juror must have had a reasonable doubt as to Mr. Horn's guilt of Count Two, and the Court should enter a judgment of acquittal as to this Count.

### (C) Count Three – Disorderly or Disruptive Conduct in a Capitol Building

Count Three required the government to prove three elements beyond a reasonable doubt. ECF No. 82 at 16. First, Mr. Horn "engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings." Second, he "did so with the intent to impede, disrupt, or

disturb the orderly conduct of a session of Congress or either House of Congress," and third, he did so "willfully and knowingly."

The same reasons Mr. Horn cited in part II(B) of this memorandum are also why the Court should enter a judgment of acquittal as to Count Three. He incorporates those arguments herein by reference.

### (D) Count Four – Parading, Demonstrating, or Picketing in a Capitol Building

To prove Count Four, the government needed to introduce proof beyond a reasonable doubt that Mr. Horn: (i) "paraded, demonstrated, or picketed in any of the United States Capitol Buildings;" and (ii) he "acted willfully and knowingly." ECF No. 82 at 19.

That the Court should take Count Four away from the jury and enter a judgment of acquittal as to Mr. Horn is, hopefully, obvious. The government did not introduce any evidence that Mr. Horn "paraded," "demonstrated," or "picketed" at any point on January 6, 2021. Contrary to what it may have suggested during the trial, merely walking around the Capitol or walking inside its hallways is not "parading," "picketing," or "demonstrating."

The Court instructed the jury that the terms "parade" and "picket" have their "ordinary meanings." The dictionary defines the verb "parade" as "to exhibit ostentatiously" and "picket" to mean, among other things, "to walk or stand in front of as a picket." *See* "Parade" and "Picket," Merriam-Webster.com, accessed Oct. 26, 2023, available at https://www.merriam-webster.com/dictionary/parade; https://www.merriam-webster.com/dictionary/picket. "The term 'demonstrate' refers to conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings, but does not include activities such as quiet praying." ECF No. 82 at 19.

These definitions establish that the government was required to prove that Mr. Horn did more than merely walk around the building in order to be guilty of Count Four. But, as is clear from his video (Government's Exhibit 505), walking around the Capitol and its grounds is truly the extent of Mr. Horn's conduct that day. For that reason, the Court should also enter a judgment of acquittal as to Count Four. Far from simply entertaining doubt as to whether he engaged in that conduct, a reasonable juror would have concluded that Mr. Horn is wholly innocent of that crime.

*****************************************

### III. CONCLUSION

Stephen Horn was in Washington, DC on January 6, 2021, and went into the Capitol and on its grounds. He has never denied that he was, either to the FBI during his initial interview with counsel in February 2021 or before this Court in pretrial submissions and trial testimony. But being present at the Capitol that day does *not* mean he is guilty of the four offenses with which he was charged. Unfortunately, the jury appears to have misunderstood that the government was required to prove far more than his mere presence at the Capitol and convicted him on that basis alone. To prevent this miscarriage of justice, Rule 29 allows the Court to set aside the jury's guilty verdicts and enter judgments of acquittal as to each count. Mr. Horn respectfully contends that the law requires the Court to do so.

Respectfully requested this 27th day of October, 2023.

*/s/ Marshall H. Ellis*
MARSHALL H. ELLIS
Hornthal, Riley, Ellis & Maland, LLP
301 East Main Street
Elizabeth City, NC 27909
Telephone: 252-335-0871
Fax: 252-335-4223
Email: mellis@hrem.com
N.C. State Bar No. 47720
Retained Counsel for the Defendant

*/s/ Charles R. Haskell*
Charles R. Haskell
LAW OFFICES OF CHARLES R. HASKELL, P.A.
641 Indiana Ave. NW
Washington, DC 20004
(202) 888-2728
Email: charles@charleshaskell.com
DC Bar No. 888304007
Retained Counsel for the Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

Ashley Akers
DOJ-CIV
Commercial Litigation Branch
1100 L Street Northwest
Washington, DC 20530
(202) 353-0521
Email: ashley.akers@usdoj.gov

Sonia Williams Murphy
DOJ-CIV
Civil Division - Commercial Litigation Branch
1100 L Street NW
Washington, DC 20530
202-305-3067
Email: sonia.murphy@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on October 27, 2023, using the CM/ECF system which will send notification of such filing to the above.

This the 27th day of October, 2023.

*/s/ Marshall H. Ellis*
MARSHALL H. ELLIS
Hornthal, Riley, Ellis & Maland, LLP
301 East Main Street
Elizabeth City, NC 27909
Telephone: 252-335-0871
Fax: 252-335-4223
Email: mellis@hrem.com
N.C. State Bar No. 47720
Retained Counsel for the Defendant

*/s/ Charles R. Haskell*
CHARLES R. HASKELL
LAW OFFICES OF CHARLES R. HASKELL, P.A.
641 Indiana Ave. NW
Washington, DC 20004
(202) 888-2728
Email: charles@charleshaskell.com
DC Bar No. 888304007
Retained Counsel for the Defendant