## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-301 (TJK)** |
| | : | |
| **STEPHEN ETHAN HORN,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Stephen Ethan Horn to ten months of incarceration, at the higher end of the government's calculated Sentencing Guidelines range of six to twelve months, twelve months of supervised release, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Stephen Ethan Horn, a 25-year-old computer programmer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Following a jury trial, Horn was convicted of violations of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C.  § 5104(e)(2)(G).

As explained herein, a sentence of ten months of incarceration is appropriate in this case because Horn (1) filmed the assault on the police line at the Northwest Stairs; (2) entered the Capitol building through a visibly broken door while alarms blared; (3) joined a group of rioters that outnumbered and overran a police line in the Crypt; (4) joined a group of rioters that confronted and overran officers guarding the House Chamber where members of Congress and their staff were sheltered in place and eventually evacuated – and then remained outside the House Chamber as rioters pounded on the doors and demanded entry; (5) climbed on a statue in the Rotunda and watched as rioters violently assaulted police officers; (6) refused to leave the Capitol, despite exposure to chemical irritants and commands to leave the building, until police officers corralled rioters out; (7) remained in the Capitol building for a full hour; (8) watched as rioters attempted to re-breach the Capitol building on the East Front and continued to act destructively, including by deflating tires on government vehicles; (9) repeatedly understated his conduct under oath at trial; and (10) has continued to publicly call into question the intentions and actions of police officers on January 6 rather than take responsibility for his actions. Horn's participation in the Capitol riot was prolonged and his presence was impactful.

The Court must also consider that Horn's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside

so many others, the riot likely would have failed. Here, the facts and circumstances of Horn's crime support a sentence of ten months of incarceration, twelve months of supervised release, 60 hours of community service, and $500 in restitution.

## II.     Factual and Procedural Background

*The Charges and Trial*

On March 29, 2021, the United States charged Horn by criminal complaint. On April 9, 2021, law enforcement officers arrested Horn in Raleigh, North Carolina. On April 13, 2021, the United States charged Horn in a Four Count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 13, 2023, a jury trial was held against Horn. On September 18, 2023, the jury convicted Horn on all counts.

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Affidavit in Support of Criminal Complaint).

*Defendant Horn's Role in the January 6, 2021 Attack on the Capitol*

Horn was a knowing participant in the mob attack on the U.S. Capitol. After attending some of the "Stop the Steal" rally near the Ellipse in Washington, D.C., Horn marched towards the U.S. Capitol with a mass of others, arriving on Capitol grounds shortly before 2:00 p.m. Horn wore a black helmet, glasses, dark jacket, backpack, gloves (that he wore outside and inside the Capitol building), and dark pants. Trial Tr. 176:25 – 177:1-2 (9/14/2023).



*Government Exhibit 603*

As Horn approached the Capitol grounds, rioters around him chanted "Stop the Steal" and "Fight for Trump!" as others climbed on the Peace Circle statue. Trial Tr. 180:1-5 (9/14/2023); Govt Ex 505 at 1:30-3:15. When he reached Capitol grounds, Horn walked past downed bicycle rack barriers (Govt Ex 505 at 2:37, 3:33), climbed over an Olmstead wall (Govt Ex 505 at 3:50-4:00), and marched directly over toppled snow fencing with visible "AREA CLOSED" signs (Govt Ex 505 at 4:06-4:15). *See* Trial Tr. 181:22-23 (Area Closed signs), 182:12-13 (snow fencing on ground) (9/14/2023); Trial Tr. at 55:1-15, 59:12-13 (9/14/23) (signage and barriers); Trial Tr. 64:7 (9/15/2023).

When Horn approached the Northwest Stairs on the West Lawn, he watched as rioters confronted the last police line standing between the mob and the Capitol building. Trial Tr. 32:20-22 (9/15/2023). Rioters around Horn yelled "Hang traitors! Traitors will hang! Traitors will hang!," Trial Tr. 186:6-7 (9/14/2023), and chanted "USA USA!" and "stop the steal!," *e.g.*, Govt

Ex 505 at 8:20-10:20. Horn watched as rioters near him threw objects, like a large traffic cone, at the police line. Trial Tr. 185:8-1 (9/14/2023); Trial Tr. 32:10-16 (9/15/2023).

Shortly thereafter, the rioters on the Northwest Staircase collectively charged forward, overrunning the police line and gaining access to the upper courtyard. Trial Tr. 106:1-2, 16-19 (9/14/2023). Horn ran to the base of the staircase. Govt Ex 505 at 11:00-12:00. He used a bicycle rack turned ladder to gain access to the Northwest Staircase. Govt Ex 505 at 12:40; Trial Tr. 187:3-8 (9/14/2023). As he made his way up the stairs, rioters dressed in makeshift tactical gear cheered the crowd up the stairs and passed forward weapons such as a baton and large piece of wood. Trial Tr. 187 at 24, 190:2-6; Govt Ex 505 at 13:20-14:00. After passing more downed bicycle racks, Horn reached the upper terrace. He walked by a journalist – filming with a full camera crew – as he made his way to the Senate Wing Door. Trial Tr. 192:15-23 (9/14/2023).

As Horn reached the Senate Wing Door – an emergency egress door – rioters around him chanted "Whose House? Our House!" Trial Tr. 194:10 (9/14/2023); Govt Ex 505 at 14:51. When Horn approached the door, he saw shattered glass in the windows and doors and heard sirens blaring overhead. Govt Ex 505 at 15:22-30; Trial Tr. at 45:18-19 (9/14/23); 195:5 (siren), 196:4 (broken glass) (9/14/2023); Trial Tr. 63:19-20 (9/15/2023) (broken glass); Trial Tr. 11 (9/15/2023) (siren). Just as Horn was about to enter the building, a nearby rioter warned Horn that police were permitted to use lethal force against members of the crowd who entered. Trial Tr. 194:16-22 (9/14/2023). Resolving that the person didn't "kn[o]w what he was talking about," Trial Tr. 34:1-2 (9/15/2023), Horn chose to enter anyway. Moments later, Horn heard a loud noise and quickly exited that same door. He waited a few minutes and chose to re-enter the building. Govt Ex 505 at 17:25.

Horn walked towards the Crypt with a mass of rioters. Along the way, he entered an office, Govt Ex 505 at 17:54, and then wandered alone down an empty hallway, Trial Tr. 197:10-19 (9/14/2023). Horn then rejoined the other rioters and marched towards the Crypt.

As Horn entered the Crypt, he made his way quickly to the front of the pack of rioters and faced a thin line of police officers. Trial Tr. 112:16-18 (9/14/2023); Govt Ex 408 at 2:18:28-2:19:20. Rioters – Horn included – chanted "USA! USA!" as the crowd aggressively confronted the officer line. Trial Tr. 200:23-24. Rioters climbed on statues and continued to chant as more rioters poured into the Crypt. *E.g.*, Govt Ex 505 at 21:00-21:09, 24:00-24:05.

As rioters and officers continued to face off, Horn broke another rioter's flagpole. Trial Tr. 3820-25 (9/15/2023); Trial Tr. 66:1-2 (9/15/2023). When the other rioter became agitated at Horn for destroying his property, Horn uttered, "this is wild" and moved to a different side of the Crypt. Trial Tr. 201:17-18 (9/14/2023); Govt Ex 505 at 24:35. Minutes later, the mob had grown large enough to overwhelm the police line. Horn and other rioters collectively stormed forward, overtaking the police line and charging deeper into the building. Trial Tr. 202:4-9 (9/14/2023). The crowd loudly cheered as they surged forward. Govt Ex 505 at 24:14-26:00.

Horn progressed forward with the group into Memorial Hall. Govt Ex 403; Govt Ex 505 at 27:43. There, rioters chanted "WHOSE HOUSE? OUR HOUSE!" as they marched to the second floor toward Speaker of the House Nancy Pelosi's office, which was identified by a sign. Govt Ex 505 at 32:38.

Once on the second floor, Horn entered the Rotunda, but quickly turned around and walked down the hall and through Statuary Hall. Govt Ex 505 at 32:02. Just past Statuary Hall, Horn joined the crowd of rioters confronting another police line. Govt Ex 639 at 1:03:15; Govt Ex 404 at 2:35:56 p.m. This police line guarded the doors to the House Chamber, where members of the

House of Representatives were barricaded and eventually evacuated from the joint session because of the presence of rioters. Trial Tr. at 75:11-18, 79:14-16 (9/14/23). Media members and others remained in the House Chamber.

As the crowd grew, it gained enough force to overrun the police line. Horn and other rioters surged forward towards the House Chamber door. Rioters chanted "STOP THE STEAL!" and "LET US IN!" as they pounded on the House Chamber door. *E.g.*, Govt Ex 505 at 36:51. Countless rioters video recorded the chaos using mobile telephones and other recording equipment. Trial Tr. 210:11-14 (9/14/2023); Trial Tr. 108:4-7 (9/15/2023).

At this time, law enforcement inside the House Chamber, including Lieutenant George McCree, could hear the rioters banging on the door and chanting outside the chamber. Trial Tr. 81:15-20, 82:12, 91:10-12 (9/14/23). At trial, Lieutenant McCree described the terrifying nature of being responsible for the protection of the members of Congress in such a chaotic scenario: "It was very difficult. It was a very chaotic situation, a very dangerous situation. They were clearly desiring to do harm to the members - - specific members as well as just members in general, it seemed. And so it was a very difficult day." *See generally id.* at 80-83, 88-94, 95:4-8.

As rioters continued to pound on the House Chamber door, one yelled, "BREAK THAT FUCKING DOOR DOWN!" and others chanted "USA!" and "STOP THE STEAL!" Trial Tr. 113:4-8 (9/15/2023); Govt Ex 639 at 1:05:20. Minutes later, a nearby rioter told Horn that someone had been shot. Govt Ex 505 at 44:53. Many rioters immediately scattered from the area. Horn stayed. Trial Tr. 114:22-25 (9/15/2023).

Eventually police fired chemical irritant in the area to disperse the crowd. Govt Ex 405 at 2:36:32 p.m. Only then did Horn back away from the House Chamber door and enter an adjoining room to escape the smoke-filled air. Trial Tr. 215:13-15 (9/14/2023). Horn walked back through

Statuary Hall, passing a group of rioters as one declared, "All-out war! This is all out war! We'll kill everybody, right?!" Trial Tr. 216:7-8 (9/14/2023); Trial Tr. 47:1-3 (9/15/2023); Govt Ex 505 at 48:30.

Horn entered Speaker of the House Nancy Pelosi's office. Govt Ex 505 at 49:18. He walked past rioters rustling through personal belongings and effects, and then he briefly looked at a television showing live coverage of the Capitol siege. Govt Ex 505 at 49:55. Horn saw a medal given to Nancy Pelosi, then asked, "Is this Pelosi's office?" He then stated, "even so, don't break it." Govt Ex 505 at 50:00-51:10.

A few minutes later, Horn sprinted out of the office. Trial Tr. 116:21-22 (9/14/2023); Govt Ex 505 at 51:36; Govt Ex 407 at 2:51:19 p.m. He re-entered the Great Rotunda, a "highly honored spot in the Capitol," as Lieutenant McCree testified. Trial Tr. 117:25–118:3. As Horn entered the Great Rotunda, a loud siren blared overhead. Govt Ex 505 at 52:58. Horn told another rioter, "We should have looked at the floor plans before we came," Trial Tr. 218:20-21 (9/14/2023); Govt Ex 505 at 56:20, and the other rioter responded, "We didn't think we'd make [it] this far," *id.* 218:25 – 219:1.

A few minutes later, a group of rioters confronted a line of officers guarding a doorway near an Abraham Lincoln statue. The statues in the Rotunda are "considered to be of the highest honor" in the Capitol. Trial Tr. 118: 8-12 (Lieutenant McCree). Horn climbed on the Lincoln statue and watched and recorded the melee on his cell phone. Trial Tr. 222:8 (9/14/2023).

Owing to their overwhelming numbers, the rioters had a tactical advantage over the police during this fight. The officers, including Lieutenant Patete, were in a precarious position – with an angry mob at their front and a marble staircase at their back. Lieutenant Patete and her colleagues fought valiantly to protect the building and its lawful occupants. Trial Tr. 155:11-14 (9/14/23);

Trial Tr. 156:9-16 (9/14/23) (Lt. Patete: "I just was unable to get any – like, any more bodies. There just weren't any."). As such, every rioter in the crowd posed a threat to the officers at that moment. Trial Tr. 151: 15-20 (9/14/23) ("Everyone was a threat and they were working in concert to just come inside and harm the officers."); *id.* 163:8-25; *id.* 160:2 ("[A]s the crowd continued to push the officers trying to breach the line, the officers got closer and closer to the stairs."); *id.* 160:19-25. Even rioters who were not being assaultive were deemed threatening, because, as Lieutenant Patete testified, the officers did not have the luxury of assessing each rioter individually in a time of such chaos. Trial Tr. 152:1-13, 155:20-24 (9/14/23) ("you can't tell who's hitting whom; you can't apprehend anyone; you can't really discern where the blows are coming from when you're being assaulted."); Trial Tr. at 161:22-25 (9/14/23) ("[I]t's pretty difficult to, like, evaluate each specific person just because everyone's so packed in and smushed together and hands and weapons are overlapping. So it was more the group as a whole."). Like many others around him, Horn video recorded the violence. *See generally* Govt Ex 505 at 59:00-1:03:25.

Another rioter eventually yelled at Horn to get off the Lincoln statue, and he did. Govt Ex 505 at 1:03:25. Around that time, officers had started to corral rioters out of the Rotunda through the Rotunda Doors. Govt Ex 412 at 3:02:00 p.m. Horn exited the Capitol building with that crowd after being inside the Capitol building for nearly an hour.  Trial Tr. 223:10-11 (9/14/2023); Govt Ex 505 at 1:07:04.

After leaving the building, Horn remained on the East Front of the Capitol grounds. Trial Tr. 223:18-20 (9/14/2023). He watched as several rioters celebrated their successes. One proclaimed, "Mission accomplished! You occupied the building, they had to stop what they were doing!" Trial Tr. 227:18-20 (9/14/2023). Another rioter yelled about the integrity of the elections and exclaimed that the election was stolen. *E.g.*, Govt Ex 505 at 1:37:40. Rioters continued to tout

their successes in overtaking the Capitol and they chanted things like, "fight for Trump!" Govt Ex 505 at 1:35:04.

While still on restricted Capitol grounds, one rioter asked Horn about being inside the Capitol building. Horn responded that it was "dangerous." Trial Tr. 226:2-6 (9/14/2023). Horn aided another rioter with a first aid kit and helped make way for another injured rioter leaving the building. Trial Tr. 44:20-21 (9/15/2023). Horn watched as another rioter deflated the tires of government vehicles. Trial Tr. 226:19-21 (9/14/2023); Govt Ex 505 at 1:49:01. The mob reapproached the now-secured Rotunda Doors and tried to force entry again. Horn joined the crowd and watched as rioters pounded on the door. Govt Ex 505 at 1:52:59.

Eventually, after being on Capitol grounds for two hours, Horn left.

After January 6, Horn posted his video recording to his Facebook account, which had 33 friends. Trial Tr. 175:5 (9/14/2023).

*Horn's Trial Testimony*

At trial, Horn testified in his defense. During his testimony, Horn continued to state as facts things he did not witness, insisted on inserting many nonresponsive answers to advance his narrative, and fabricated intentions to justify nearly all his actions at the Capitol on January 6.

For example, Horn repeatedly testified that his only purpose at the Capitol was to record the events for journalistic purposes. Trial Tr. 22:15-17 (9/15/2023). But his actions were not consistent with that of a journalist. For example, minutes after he entered the Capitol building, Horn walked down an empty hallway away from the initial influx of rioters storming the Capitol. When questioned on cross examination why he separated from the crowd, he testified that he had to go to the restroom. But as the evidence demonstrated at trial, for the next two hours, despite passing numerous areas with restrooms throughout the Capitol building, Horn never looked for or

attempted to go to the restroom.  Trial Tr. 46:1-5 (9/15/2023). When Horn entered Speaker of the House Nancy Pelosi's office, he did not document rioters going through her personal belongings and effects. Govt Ex 505 at 49:18. Rather, he testified that a mob of rioters occupying Speaker Pelosi's office was not newsworthy.  Trial Tr. 105:9-10 (9/15/2023). When Horn was outside in the early hours of the riot, he testified that he saw a person being carried off in a stretcher, Trial Tr. 33:2-3 (9/15/2023), but he did not investigate or document the medical emergency. And when he was inside the Capitol building, he was told that someone was shot, but he did not investigate or leave his position near the House Chamber.

And when Horn was in the Crypt facing a line of outnumbered officers, he joined rioters in chanting "USA USA!" At trial, Horn testified that he chanted only because he was afraid that surrounding rioters would notice if he didn't chant, suspect him to be an undercover journalist, and attack him, because violent rioters "don't like to be recorded." Trial Tr. 47:11-25 (9/15/2023); Trial Tr. 49:2-10 (9/15/2023). This testimony doesn't comport with his other actions throughout the day. For example, later in the day Horn climbed on a statue and openly used his cell phone to record a violent altercation between rioters and police officers – without regard to whether he would be identified as a journalist. His testimony was also belied by the overwhelming video evidence presented at trial, which showed countless rioters using phones and other devices, including professional camera equipment, to record the chaos throughout the day – none of whom Horn saw being attacked. Trial Tr. 121:16-25 (9/15/2023).

Horn similarly provided incredible testimony about his social media. On cross examination, Horn unequivocally testified that he did not have social media accounts other than those already identified at trial – his personal Facebook account with 33 friends, which allegedly had a page named "TriangleTriangle," and a Twitter account with one follower. Trial Tr. 94:10

11

(9/15/2023). But on re-direct, Horn changed his testimony, asserting that, in addition to the "right leaning" social media, he *also* had an entirely different Facebook account that was focused "more of the left side of things." Trial Tr. 129:5-9 (9/15/2023).

Horn also repeatedly denied involvement or interest in protests as a participant. But evidence presented at trial demonstrated that he had a documented history of protesting at political in nature rallies, with no mention of journalism. Trial Tr. 242:8-9 (9/14/2023); Trial Tr. 242:21-25 – 243:1-4 (9/14/2023); Trial Tr. 249:18-25–250:1-4 (9/14/2023); Trial Tr. 251:16-18 (9/14/2023).

Horn was part of numerous Facebook groups related to the presidential election, despite disclaiming adherence or partiality to any particular political party or movement. Trial Tr. 81:4-7 (9/15/2023) ("Joe Biden is not my president"); Trial Tr. 81:9-12 (9/15/2023) ("#StoptheSteal! We need one million"); Trial Tr. 82:1-3 (9/15/2023) ("STOP THE STEAL"). Horn refused to acknowledge that he joined these specific groups; in fact, he repeatedly suggested that the group names may have changed after he joined the groups, despite no evidence to support that. *See generally* Trial Tr. 81-82 (9/15/2023) ("I believe that was apparently the name of the group at the time this warrant –"), ("Once again, it appears that was the name at this time."). Horn also testified that he was a member of these groups only because he was "keeping tabs on what other people were posting, what people were saying about stuff." Trial Tr. 23:15-18 (9/15/2023). When confronted with numerous messages of a political nature between him and his friend JR, Horn claimed that, despite opening these messages, he did not often read JR's messages. Trial Tr. 87:9-10 (9/15/2023). But the evidence demonstrated that it was Horn who invited his friend JR to a "Stop the Steal" group, Trial Tr. 91:6-9 (9/15/2023), and there were numerous instances of Horn responding to JR's messages of this nature.

### III.     Statutory Penalties

Horn now faces a sentencing on all four counts. As noted by the U.S. Probation Office, Horn faces up to one year of imprisonment for his violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and six months imprisonment for his violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). He also faces a fine of up to $100,000.

### IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

In the PSR, the Probation Office started with the grouping analysis in Part D of Chapter 3, and then performed the Guidelines analysis, but only for Count Two. The U.S. Probation Office calculated Horn's guidelines as follows:

| Count Two: 18 U.S.C. § 1752(a)(2) | | |
|---|---|---|
| Base Offense Level | U.S.S.G. § 2A2.4(a) | +10 |
| Acceptance of Responsibility | U.S.S.G. § 3E1.1(a) | 0 |
| Zero-Point Offender | U.S.S.G. § 4C1.1 | -2 |
| **Total Offense Level** | | **8** |

PSR ¶¶ 46-54.

The Probation Office calculated Horn's criminal history as a Category I. PSR at ¶ 57. Accordingly, applying the Zero Point Offender Reduction, the Probation Office calculated Horn's

offense level for the group as 8 and the corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 94.

The government disagrees with Probation on the process to calculate that offense level and the application of the Zero Point Offender Reduction.

*Calculation of Offense Level.* The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply appropriate specific offense characteristics, cross references, and special instructions; and third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. §1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. §1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

As stated above, the Probation Office did not employ this specified procedure to determine the total combined offense level. The appropriate offense level computations for Count One and Count Two, prior to any grouping analysis under Part D of Chapter 3, are as follows:

Count One: 18 U.S.C. § 1752(a)(1)
| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2B2.3(a) | +4 |
| Specific Offense Characteristics | U.S.S.G. §2B2.3(b)(1)(A) | +2 |
| **Total Offense Level** | | **6** |

Count Two: 18 U.S.C. § 1752(a)(2)
| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2A2.4(a) | +10 |
| **Total Offense Level** | | **+10** |

*See* PSR at ¶¶ 33-46.

*Zero-Point Offender Reduction (U.S.S.G. § 4C1.1).* The government disagrees with the Probation Office on the application of the Zero Point Offender Reduction. Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The Court should not apply § 4C1.1 here because the January

6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g.*, *United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions.").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter

any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[2]

*Grouping.* The government agrees with the Probation Office that Counts One and Two group because all involve the same victim: Congress. U.S.S.G. §3D1.2(d). The offense level for that Group is the level "for the most serious of the counts compromising the Group, *i.e.*, the highest offense level of the counts in the Group." U.S.S.G. §3D1.3(a).

Count Two has the highest offense level for any count in the group. Thus, under the government's guidelines calculation – without applying § 4C1.1 – the offense level for the group is **10**. Accordingly, Horn's Guideline imprisonment range calculation is 6 to 12 months.

Here, while the Court must consider the Section 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

---

[2] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of ten months of incarceration, thirty-six months of supervised release, 60 hours of community service, and $500 in restitution.

### A.      The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F. Supp. 3d 1, 8 (D.D.C. 2021). While assessing Horn's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Horn, the absence of violent or destructive acts is not a mitigating factor. Had Horn engaged in such conduct, he would have faced additional criminal charges.

Horn was on Capitol grounds for two hours. He entered the Capitol building shortly after the initial breach and was involved in several pivotal breaches of police lines, including in the Crypt, near the House Chamber, and in the Rotunda. Horn contributed to the failed efforts of the officers – his participation in the mob undoubtedly contributed to overwhelming officers at various points in the Capitol. While in the building, Horn broke another rioter's flagpole, he assumed a tactical position on a statue during a violent brawl, he joined a group of rioters that overran officers

so the mob could reach the House Chamber where our lawmakers had been performing their constitutional duties, and he joined chanting in the Crypt as rioters faced off with officers. Despite learning that a person had been shot in the building and being exposed to chemical irritant, Horn remained in the building until police officers corralled rioters out. Since January 6, Horn has expressed no remorse for the effect of the riot, nor has he accepted responsibility for his participation. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of ten months of incarceration in this matter.

### B.    Horn's History and Characteristics

Horn, 25, has been employed as a computer programmer by his father's company. Horn does not have a criminal history. Horn has been compliant with his conditions of pre-trial release.

Horn's family has a multimedia production company that produces documentaries. Horn's father testified that his family, Horn included, produced a documentary at the U.S. Capitol years before January 6, 2021. Trial Tr. 150:18-20 (9/15/2023). In that process, the Horn family became aware of the rules and decorum for filming inside the Capitol, in addition to the security procedures required of all visitors who enter the Capitol building. *Id.* at 150-151 (9/15/2023); *id.* at 65:1-2.

Horn maintains a website related to January 6, where he explores and documents topics related to January 6, including "whether the police opened the doors or allowed the breach to happen." PSR ¶ 83.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).

*Specific Deterrence:* There is a need for specific deterrence in this case. To date, Horn has not expressed any remorse or regret for his actions, nor has he acknowledged that his conduct on January 6 – joining a mob that stormed the Capitol building – was wrong. Most importantly, he

has demonstrated a profound lack of understanding of the significant impact that his crimes, along with those of his fellow rioters, have caused to this nation. Specifically, Horn has shown no understanding of the impact of his crime on the victims who suffered acts of violence of the mob that assailed them and the Capitol – much of the conduct which occurred before Horn's very eyes. Instead, Horn has continually posited himself as a victim of this prosecution. This Court should impose a sentence of ten months to specifically deter Horn from any such future crimes, to impress upon him the gravity of his crimes, and to promote the respect for the law.

**E.    The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Horn based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Horn was found guilty of four Counts: 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). The first two are Class A misdemeanors, the second two Class B misdemeanors. 18 U.S.C. § 3559. Although the Sentencing Guidelines do not apply to the Class B misdemeanors, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), apply to all four convictions.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Rivera*, 21-cr-060 (CKK), defendant Rivera, like Horn, took numerous videos of the chaos on the West front, including videos of the crowd assaulting the police line, the crowd as they breached the West Stairs, and the second breach of the Senate Wing Door. Like Horn, Rivera's video recording showed "Area Closed" signs, fencing, and toppled barriers as he marched towards the Capitol building. Also like Horn, Rivera watched as the police line was overrun on the Northwest Staircase. Shortly afterwards, Rivera made his way to the Northwest Courtyard – about the same time as Horn.

Rivera watched as rioters breached the Parliamentarian's Door and then entered the Capitol building through the window next to the Senate Wing Door while alarms were blaring. Rivera roamed the Capitol building for approximately 20 minutes. He live-streamed the chaos as he marched towards the Crypt. Rivera used both a large professional camera and a handheld cell phone to record the chaos around him. While inside the Capitol, Rivera urged his social media followers to share his broadcast. In the days after the riot, Rivera expressed no remorse or contrition for his actions. He continued to post on social media about his participation in the riot. Rivera claimed he was a cinematographer, photographer, and videographer by trade, and the only reason he was at the Capitol on January 6 was to "record the action" and "get his name out there." Rivera claimed to have documented prior Trump rallies. After Rivera was found guilty following

a bench trial of the same four misdemeanor offenses as Horn, Judge Kollar-Kotelly sentenced him to 8 months of incarceration.

Rivera's and Horn's actions on January 6 were similar, as were their purported reasons for being at the Capitol. However, Horn has additional aggravating factors because he stayed in the building three times as long as Rivera, was part of three separate groups of rioters that overran police lines, entered the sensitive office space of Speaker Pelosi, and remained on Capitol grounds after being corralled out of the building. Thus, a longer sentence is warranted for Horn.

Next, in *United States v. Alford*, 21-cr-263 (TSC), the defendant Alford was found guilty following a jury trial of the same four misdemeanor offenses as Horn. Like Horn, as Alford marched towards the Capitol on January 6, he passed obvious signs that the Capitol building and grounds were restricted. Also like Horn, Alford entered the Capitol building through a door that was visibly broken open. Alford refused to leave the Capitol building, even after police officers ordered him and other rioters to leave. Like Horn, while Alford was inside the Capitol, he learned that a person had been shot. Rather than leave the building, Alford posted two videos to Facebook "breaking" the news. After January 6, Alford spread disinformation about the riot and celebrated the supposed moral righteousness of the rioters. Like Horn, during Alford's trial, he minimized his participation in the riot and testified in a manner that was disingenuous, not forthcoming, and minimizing of his role. Judge Chutkan sentenced Alford to 12 months of incarceration.

Alford's conduct inside the building was comparable to Horn's conduct. However, Horn remained in the building longer than Alford, and, unlike Alford, entered a sensitive office and was part of several groups that overran police lines. However, Alford's rhetoric about the election and his intent for traveling to Washington, D.C. on January 6, in addition to his continued celebration of the riot after the fact, are aggravating factors not present in Horn's case. *See also United States*

*v. Niemela*, 21-cr-623 (sentenced to eleven months following a trial on the same four misdemeanors after spending 21 minutes inside the Capitol; participating in three separate breaches of police lines; failing to express remorse after the riot; and continually claiming she is a victim of the prosecution).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d

at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Horn was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[4]

Because Horn engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Horn responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Horn to pay $500 in restitution for his convictions on Counts One through Four. This amount fairly reflects Horn's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Horn to ten months of incarceration, twelve months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Horn's liberty as a consequence of his behavior.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*By: /s/ Ashley Akers*
Trial Attorney
MO Bar No. 69601
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov